# United States Court of Appeals
## For the First Circuit

No. 11-1078

OTHMANE IDY,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Boudin and Thompson, Circuit Judges.

Saher J. Macarius, with whom Audrey Botros was on brief, for petitioner.
Corey L. Farrell, Attorney, Office of Immigration Litigation, with whom Tony West, Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

March 23, 2012

**THOMPSON**, **<u>Circuit Judge</u>**. Petitioner Othmane Idy (Idy), a native and citizen of Morocco, seeks review of a decision of the Board of Immigration Appeals (BIA) affirming an immigration judge's (IJ) removal order. Idy argues that the BIA erred in two ways: first, by determining that his reckless-conduct convictions mean he committed a crime involving moral turpitude; and second, by denying him a waiver of inadmissibility. After careful consideration, we dismiss the petition for review in part for lack of jurisdiction and otherwise deny the petition.

## I. BACKGROUND

### A. Initiation of Removal Proceedings

On August 18, 2001, Idy was admitted to the United States as a nonimmigrant visitor for pleasure. Idy's visa allowed him to stay until February 17, 2002, but after the visa expired he remained in the United States without authorization.

On December 24, 2004, Idy married Maria Velazquez, a United States citizen. On February 13, 2006, Idy and Maria had an argument that culminated in a physical altercation in their New Hampshire home and criminal convictions for Idy (more on that later). Nevertheless, on April 4, 2006, Maria filed an I-130 petition to establish that she and Idy were married. The Department of Homeland Security (DHS) eventually approved the petition, marking the first step toward a legal immigration status for Idy.

-2-

But meanwhile, on April 18, 2006, DHS served Idy with a Notice to Appear (NTA), charging him with removability under 8 U.S.C. § 1227(a)(1)(B) as an alien who remained in the United States without authorization.[1]  On May 8, 2007, Idy filed written pleadings admitting the NTA's factual allegations and conceding removability.  He also indicated that he would seek relief by applying for an adjustment of status and a waiver of inadmissibility under 8 U.S.C § 1182(h).[2]  And on July 9, 2007, Idy did just that.

**B. Evidence in the Record**

On May 12, 2009, the IJ convened a hearing to address the merits of Idy's applications for an adjustment of status and, if

---

[1] This section of the Code provides as follows:

Any alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens:

. . .

(B) Present in violation of law

Any alien who is present in the United States in violation of this Act or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201 of this title, is deportable.

[2] Section 1182(h) gives the Attorney General discretion to waive the crime-of-moral-turpitude bar on admissibility (among other admissibility bars).

necessary, a § 1182(h) inadmissibility waiver.  The evidence presented to the IJ included four overlapping but occasionally markedly different versions of the same set of events: (1) Idy's and (2) Maria's separate statements to the Manchester Police in the week following the February 2006 incident, and (3) and (4) their separate testimonies before the IJ.  This case does not turn on its facts; nevertheless, because Idy's and Maria's testimonial shifts shed some light on the case and — most pertinently — Idy's convictions, we will now summarize each version.

### 1. Idy's Statements to the Manchester Police[3]

On February 13, 2006, Idy was very tired after work and wanted to sleep.[4]  Not having had much time to find Maria a Valentine's Day gift, Idy bought her chocolates, a picture frame, and a teddy bear from Rite Aid.  He placed the items on the table where Maria could find them and went to sleep.  When Maria came home, Idy asked her, "Did you like the stuff?"; she did not respond.  He wished her a happy Valentine's Day and tried to hug her but she pushed him away.  Maria was upset that he only spent $10.00 on her gift.  They began to argue.  Idy tried to avoid a confrontation by going to bed, but Maria went "psycho" and

---

[3] This section is drawn from Idy's interview with the Manchester Police on February 15, 2006.

[4] The dates of events in this case are not crystal-clear, but the best we can tell is that they began in the late hours of February 13, continued into the early hours of the 14th, and ended with Idy's statement to the police on the 15th.

repeatedly pushed him, yelled at him, and told him to leave. Instead of leaving, Idy went to sleep in the living room. Maria followed him and started pushing him. Frustrated, he tried to leave the apartment, but she pushed him in the chest to stop him. Idy managed to shove his way out of the apartment, and Maria told him not to come back.

Idy waited outside for the couple's friend Mouneer Zarveen. They went to a pizzeria across the street. When he and Zarveen returned to the apartment, Idy and Maria began to argue again. Maria told Idy that she was going to make him "go through hell." He tried to sleep on the couch but Maria threw an ashtray at his chest and began pushing and hitting him. She picked up a metal table lamp and hit him with it three times; one of the blows hit his right hand. As Zarveen tried to pull Maria away, Idy took the lamp from her. He pushed her hard several times and then grabbed her face and shoved her away. Idy stood in front of Maria holding the lamp while she sat on the couch with her hands in front of her face in a defensive position. Intending to break a clay pot on the floor, Idy "calm[ly]" walked over to the pot and "flipped it" in Maria's direction; it hit her in the head and broke upon impact.

Maria sat on the couch bleeding and crying. She told Idy to leave. He called his friend Raoof to pick him up. At 6 the next morning, Zarveen called Idy and told him that Maria was in the

hospital.   That same day, Idy went to the Manchester Police Department and gave a voluntary statement about the incident.  He claimed that he had acted in self-defense and had not intentionally hit Maria.

## 2. Maria's Statements to the Manchester Police[5]

Idy was Maria's first love.  In the beginning of their relationship he treated her fine, but then he became controlling and limited her interactions with her friends and family.  Idy did not let her go out, he made her do "womanly duties,"[6] and he threatened to leave her if she did not obey him.  Eventually, he became physically abusive and his pushes and slaps progressed into kicks and punches.  He gave Maria two black eyes and assaulted her approximately five times during a "bad month."  Afterwards, Idy would apologize and tell her that it was not going to happen again; she believed him because he was her "world."  Maria never reported the abuse to the police because Idy made her feel like he was the only one she had, and she did not want him to go to jail or be sent away.

When Maria came home on February 13, 2006, she saw two chocolate hearts and a teddy bear on the table.  Idy asked her if

_____

[5] This section is drawn from Maria's interview with the Manchester Police on February 21, 2006, seven days after the altercation.

[6] Maria defined "womanly duties" as cleaning the house and washing the laundry.

she had found the gifts; she told him that she had seen the bear and chocolates but had been expecting roses. They discussed it, she said "thank you," and then they went to bed. Idy wanted to sleep but Maria wanted to watch a movie with him. He asked her to scratch his back and she said "no." They started arguing, and he told her that she was being "fucking stupid." Idy pushed Maria away and went to sleep in the living room. She began to cry and followed him. Maria grabbed Idy and told him that she loved him. He pushed her away. She tried to hug him. Idy punched her in the face.

Maria left the living room to check her eye and when she returned, Idy was lying on the loveseat, covered with a blanket. She looked for "something small" to throw at Idy in an attempt not to hurt him. She picked up an ashtray and threw it at him and then grabbed a lamp and threw it at his feet. At this point, Idy "got crazy." He picked up the lamp with both hands and hit her in the head and arm with its base five or six times. Idy continued to hit Maria with the lamp while she stood with both hands in front of her face, trying to protect herself. She made her way to the couch where Zarveen was sleeping and, "screaming [her] lungs out" because "the pain was so painful," jumped on him so he could protect her. Zarveen woke up and began to yell at Idy to "stop." Maria fell backwards on the couch; Idy tried to hit her again. Maria blacked out from the blows and when she regained consciousness she prayed,

"Please, God, don't let me die."  She asked Zarveen to take her to the hospital.

### 3. Idy's Immigration Hearing Testimony

Consistent with his first account of events, Idy claimed that the fight started because he did not get Maria "adequate" gifts for Valentine's Day.  He awoke to Maria screaming that her gifts were not "beautiful" or "sufficient."  Idy told Maria that he would take her out the following day but she went over to the bed and began kicking him.  She followed him and continued to beat him even after he left the room to sleep on the living room couch.  Yelling, she threw an ashtray and a table lamp at him.  He pushed her away but she kept "hitting" him, so he swung the lamp's cord to defend himself.

Idy left the apartment, and when he returned with Zarveen, Maria came out of the bedroom and told him to leave.  She began hitting him again.  He "angr[ily]" pushed the flowerpot off the table, and it hit her in the head.  Idy "immediately" left the apartment and called his friend Abdalla to pick him up.  He told Abdalla that he had just had a fight with his wife and needed a place to stay.  On February 15, 2006, the morning after the incident, Zarveen called Idy and told him that the police wanted to talk to him.

Idy testified that he only found out that the flowerpot had hit Maria in the head after he was arrested, when he read about

her injuries in the newspaper. He also claimed that he had no knowledge of the laceration on Maria's left arm or her bruised eye. Idy continued to assert that he had not planned to hurt Maria and only had intended to push the flowerpot off the table. Idy testified that he was not aware that Zarveen had seen what occurred between him and Maria; this contradicted his previous statement to the police in which he claimed that Zarveen tried to get Maria away from him during the incident. Finally, Idy testified that the police threatened him and told him that they would send him to jail if he did not answer their questions.

### 4. Maria's Immigration Hearing Testimony

After a separation spanning from February 2006 to February 2008, Maria and Idy reunited and her testimony became more consistent with his account of events. Maria testified that she had seen the gifts on the table that evening and considered them thoughtless and "cheap." She pushed Idy out of the bed and followed him into the living room. They began to argue and she swore at him because he had left the gifts on the table rather than giving them to her personally. Maria threw an ashtray at Idy and it hit him on his legs, stomach, or back. Idy left the apartment and when he returned with Zarveen, she and Idy continued to argue while Zarveen "was chopped out" on the couch. Maria threw an ashtray at Idy again, followed by a metal lamp. Then she walked toward him and tried to grab the lamp and hit him with it. Maria

claimed that she did not remember what happened next, but during the struggle for the lamp, Idy hit her. She testified that when he "slung" the flowerpot at her, it caused a "big bump" on her head, which made her feel dizzy and fall on the couch. Zarveen took her to the hospital.

Maria also testified that all of her statements that Idy physically abused her were lies. She denied that she and Idy had had any physical altercations prior to the February 14, 2006 incident. Maria opined that Idy might not have been aware that the flowerpot had hit her because he turned away. She claimed that she was "angry with [her] situation" and wanted to harm Idy so she told the police that there were numerous incidents of abuse. Maria testified that her mother was there and told her to tell the police anything that would put Idy in jail. She also claimed that she was overmedicated on painkillers when she talked to the police and just wanted them to leave her alone.

## C. Injuries and Convictions

Maria sustained blunt trauma to the top of her head and injuries to her forearm, back, and eye as a result of the altercation. The injury to her head caused a blood clot in her brain. As a result, she underwent a six-hour brain surgery and was hospitalized for one week.

On February 16, 2006, Idy was charged with first degree assault. However, on February 20, 2008, Idy pled to three counts

of reckless conduct and was sentenced to eleven months in jail followed by two years of probation.[7]

**D. Immigration Decision**

On November 2, 2009, the IJ determined that Idy was ineligible for an adjustment of status because of his convictions. Although the IJ found parts of Idy's testimony regarding the February 14, 2006 incident "implausible" and "inconsistent" with the Manchester Police Department reports, he declined to make an adverse credibility finding against Idy. Instead, ruling as a matter of law, he found that moral turpitude inhered in the statutory definition of reckless conduct. Then, as a matter of discretion, he denied Idy's request for an inadmissibility waiver, finding that Idy had not established that Maria would suffer "extreme hardship" if he were removed to Morocco. The BIA affirmed the IJ's decision in a separate opinion and entered an order dismissing Idy's appeal on December 22, 2010. On January 20, 2011, Idy filed a timely petition for review.

---

[7] The exact language of Idy's convictions states the following (emphasis added):

> OTHAMANE IDY . . . on or about the 15th day of February, 2006, at Manchester, did commit the crime of Reckless Conduct, in that Othmane Idy <u>recklessly</u> engaged in conduct that placed or may have placed another in danger of serious bodily injury, when he placed Maria Idy in danger of <u>serious bodily injury</u> by throwing a flower pot from a table in close proximity to her, contrary to the form of the statute and against the peace and dignity of the State.

## II. JURISDICTION

Before proceeding to the merits of the appeal, we note that a jurisdictional issue forecloses part of Idy's argument. Under 8 U.S.C. § 1252(a)(2)(B)(i), "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section 1182(h)" — the discretionary waiver of inadmissibility for certain aliens. The exception to this rule is that we retain jurisdiction over "constitutional claims or questions of law raised upon a petition for review . . . ." 8 U.S.C. § 1252(a)(2)(D).

In his petition for review, Idy does challenge the legal basis for the immigration courts' moral-turpitude ruling, but he does not raise any legal or constitutional issue regarding the denial of the inadmissibility waiver. Instead, he only challenges the immigration courts' exercise of discretion in denying such a waiver. Section 1252(a)(2)(B)(i) therefore deprives us of jurisdiction over the inadmissibility-waiver issue. In the end, our review is limited to one legal question: whether Idy's reckless conduct convictions constitute crimes involving moral turpitude.

## III. STANDARD OF REVIEW

Where, as here, the BIA adopted and affirmed the IJ's ruling, and discussed some of the bases for the IJ's opinion, we review both the BIA's and IJ's opinions. Zheng v. Gonzales, 475 F.3d 30, 33 (1st Cir. 2007). The BIA's legal conclusions receive

de novo review, but we give "appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Gailius v. INS, 147 F.3d 34, 43 (1st Cir. 1998). Specifically, we afford Chevron deference to the BIA's statutory interpretation, applying the agency's interpretation unless it is arbitrary, capricious, or clearly contrary to law. Mejia-Orellana v. Gonzales, 502 F.3d 13, 16 & n.1 (1st Cir. 2007); Maghsoudi v. INS, 181 F.3d 8, 14 (1st Cir. 1999).

## IV. ANALYSIS

### A. Why the Moral-Turpitude Issue Matters

Let us take a step back for a moment. It is uncontested that Idy is presently removable. An adjustment of status could cure this problem, if Idy is eligible. His eligibility for a status adjustment hinges on whether his criminally sanctioned reckless conduct involved moral turpitude: if so, he cannot adjust his status; if not, it is possible he can.[8] Against this backdrop, we proceed.

### B. What Is a Crime Involving Moral Turpitude?

Our question, again, is whether Idy committed a crime involving moral turpitude. Normally we would begin by analyzing the language of 8 U.S.C. § 1182(a)(2)(A)(i)(I), the statute that

---

[8] A discretionary waiver could have gotten Idy around the removability problem, too, but we have already said we have no power to alter the immigration courts' denial of the waiver even if we were so inclined.

renders inadmissible any immigrant who has committed "a crime involving moral turpitude," to determine what Congress intended those particular words to mean. But in this arena it is well established that "Congress left the term 'crime involving moral turpitude' to future administrative and judicial interpretation." Cabral v. INS, 15 F.3d 193, 195 (1st Cir. 1994).

Turning, then, to such post-enactment interpretations, we have in the past accepted the BIA's definition of moral turpitude as conduct that "shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general" — conduct that "is per se morally reprehensible and intrinsically wrong . . . ." Maghsoudi, 181 F.3d. at 14. We have found moral turpitude in crimes involving some aggravating factor like "serious physical injury." See, e.g., Nguyen v. Reno, 211 F.3d 692, 695 (1st Cir. 2000). And although we have not explicitly said so before, we now endorse the BIA's uncontroversial position that a reckless state of mind can under some circumstances be sufficient to support a finding of moral turpitude. The BIA has consistently held that to be the rule. See, e.g., Matter of Franklin, 20 I. & N. Dec. 867, 870 (B.I.A. 1994) (holding that Missouri's reckless conduct statute establishes a crime involving moral turpitude); Matter of Wojtkow, 18 I. & N. Dec. 111, 112-13 (B.I.A. 1981) (holding that New York's reckless conduct statute

-14-

establishes a crime involving moral turpitude); Matter of Medina, 15 I. & N. Dec. 611, 613-14 (B.I.A. 1976) (holding that Illinois's reckless conduct statute establishes a crime involving moral turpitude).  Applying Chevron deference, our sister circuits have agreed that the BIA's interpretation is reasonable.  See, e.g., Knapik v. Ashcroft, 384 F.3d 84, 90 (3d Cir. 2004) (holding that "the BIA did not act unreasonably in concluding New York's first degree reckless endangerment statute is a crime involving moral turpitude"); Franklin v. INS, 72 F.3d 571, 573 (8th Cir. 1995) (affirming Franklin, 20 I. & N. Dec. 867, as reasonable).  We agree, too.

To determine whether a crime is one involving moral turpitude, we first look to "[t]he inherent nature of the crime of conviction, as defined in the criminal statute," to see whether it fits the parameters outlined above.  Maghsoudi, 181 F.3d at 14.  If so, our inquiry may end there; however, if the face of the statute is insufficient for us to make a moral-turpitude determination (e.g., if the statute contains both crimes that involve moral turpitude and crimes that do not) then we may look to the record of conviction — the indictment, plea, verdict, and sentence.  Id.

Before conducting this exercise here, we must dispatch one of Idy's arguments: he says that for an assault-based crime to involve moral turpitude, it must involve a death.  But we have squarely rejected this argument before, so it is simply beyond

-15-

debate that crimes involving moral turpitude are not limited to those causing death. See Nguyen, 211 F.3d at 695 (rejecting the argument that death to another person is a necessary element of a crime involving moral turpitude); see also Knapik v. Ashcroft, 384 F.3d 84, 90 n.5 (3d Cir. 2004) (noting that the petitioner's "good fortune in not . . . killing anyone does not change the quality of his actions"). With that out of the way, we turn to the question whether reckless conduct as defined by New Hampshire law inherently involves moral turpitude.

## C. New Hampshire's Reckless-Conduct Crime Involves Moral Turpitude

Under New Hampshire criminal law, "[a] person is guilty of reckless conduct if he recklessly engages in conduct which places or may place another in danger of serious bodily injury." N.H. Rev. Stat. Ann. § 631:3 (2011). Section 626:2 defines "recklessly" as follows:

> A person acts recklessly with respect to a material element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation.

And § 625:11 defines "serious bodily injury" as "any harm to the body which causes severe, permanent or protracted loss of or

-16-

impairment to the health or of the function of any part of the body."

Recall that we owe deference to the BIA's determination that New Hampshire's reckless conduct statute is a crime involving moral turpitude, if that determination is neither arbitrary nor contrary to law. Here, the BIA held that the statute contains both "reprehensible conduct" and "some degree of scienter," and therefore that Idy's convictions were for a crime involving moral turpitude. Specifically, the BIA adopted the IJ's determination that reckless conduct is necessarily reprehensible because its definition includes an aggravating factor — "serious bodily injury" — and satisfies the scienter element because it requires a classic formulation of recklessness — actual awareness and a conscious disregard for a "substantial and unjustifiable risk." See N.H. Rev. Stat. Ann. §§ 626:2, 631:3. This determination is plainly reasonable, and it perfectly reflects the state of the law of crimes involving moral turpitude; therefore, we are bound to conclude that reckless conduct under New Hampshire law is inherently a crime involving moral turpitude. See Nguyen, 211 F.3d at 695; see also Matter of Franklin, 20 I. & N. Dec. 867, 870 (B.I.A. 1994).[9]

---

[9] Idy seems to be concerned that our conclusion will render morally turpitudinous all assault crimes, but any such concern is misplaced. Our decision involves only New Hampshire's reckless-conduct statute, N.H. Rev. Stat. Ann. § 631:3, which features an aggravating factor and therefore falls at the more serious end of

## V. CONCLUSION

For the reasons stated above, we **<u>dismiss</u>** the petition in part for lack of jurisdiction and **<u>deny</u>** the petition in all other respects.  **<u>So ordered</u>**.

---

the assault spectrum.  (In New Hampshire, reckless conduct falls under the umbrella of "Assault and Related Offenses."  <u>See</u> N.H. Rev. Stat. Ann ch. 631.)  We express no opinion on other assault crimes.