# United States Court of Appeals
## For the First Circuit

No. 11-1847

JOAO PALMEIRA DA SILVA NETO,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Circuit Judge</u>,
Souter, <u>Associate Justice</u>,[*]
and Stahl, <u>Circuit Judge</u>.

<u>Ilana Etkin Greenstein</u>, Kaplan, Friedman & Associates, with whom <u>Harvey Kaplan</u> and <u>Jeremiah Friedman</u> were on brief for petitioner.
<u>Dara S. Smith</u>, Trial Attorney, United States Department of Justice, Civil Division, Office of Immigration Litigation, with whom <u>Tony West</u>, Assistant Attorney General, Civil Division, and <u>David V. Bernal</u>, Assistant Director, Office of Immigration Litigation, were on brief for respondent.

May 10, 2012

---

[*] The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL, Circuit Judge**.  This appeal presents the discrete question of whether malicious destruction of property under Massachusetts law qualifies as a crime involving moral turpitude (CIMT).  We conclude that it does and therefore deny the petition for review.

## I. Facts & Background

Joao Palmeira Da Silva Neto (Palmeira) is a native and citizen of Brazil.  He entered the United States without inspection in 1994 with his wife, Maria, who is also a Brazilian citizen.  Together, the Palmeiras had two children, who are both United States citizens.  Eventually, the Palmeiras separated.  On January 1, 2006, Maria invited Palmeira to a New Year's party at her house.  Despite the fact that Maria had a restraining order against him, Palmeira attended the party.  He got drunk at the party and, after initially leaving, quickly returned to Maria's house, wishing to speak with her.  When his wife would not open the door, Palmeira kicked it open; once inside the home, he broke some glass[1] and apparently threw some furniture.  Police officers were dispatched to Maria's house for a report of a disturbance, and Palmeira was arrested at the scene.

---

[1] The police report states that the foyer and kitchen floor of Maria's house were covered in glass when the arresting officers arrived.  During his removal hearing, Palmeira testified that he "slapped" some glasses or bottles on a table, causing them to fall and break, though the police report suggests that there was glass in the door that shattered when Palmeira kicked it in.

Palmeira admitted to sufficient facts to support a finding of malicious destruction of property under Mass. Gen. Laws ch. 266, § 127, with the (unfortunately incorrect) understanding that doing so would not cause him immigration problems. He was sentenced to eleven months of probation and an anger management program, both of which he completed. On January 26, 2007, the district court in Brockton, Massachusetts dismissed all charges against Palmeira.[2] Nonetheless, the Department of Homeland Security (DHS) took Palmeira into federal custody and instituted removal proceedings against him.

Before the Immigration Court in Boston, Palmeira applied for cancellation of removal, which "is a form of discretionary relief, the granting of which allows a non-resident alien, otherwise removable, to remain in the United States." Ayeni v. Holder, 617 F.3d 67, 70 (1st Cir. 2010); see also 8 U.S.C. § 1229b(b). The Immigration Judge (IJ) denied Palmeira's application, finding that he had not established that his removal would cause "exceptional and extremely unusual hardship" to his United States citizen children. 8 U.S.C. § 1229b(b)(1)(D). Palmeira appealed to the Board of Immigration Appeals (BIA), which granted the appeal and remanded the case to the IJ for

---

[2] On April 21, 2010, Palmeira filed a motion with the state court to vacate his conviction. Palmeira has not mentioned that motion in his brief on appeal; we therefore can only assume that it has not been granted.

consideration of additional evidence that Palmeira had provided regarding his wife's mental health and her ability to care for their children in his absence. The BIA also directed the IJ to make a finding as to whether Palmeira could qualify as "a person of good moral character" for purposes of cancellation of removal, given his conviction for malicious destruction of property. Id. § 1229b(b)(1)(B); see also id. §§ 1101(f)(3), 1182(a)(2)(A)(i)(I).

On remand, the IJ focused on whether Palmeira's conviction for malicious destruction of property prevented him from qualifying as a person of good moral character, finding that question to be outcome-determinative. She concluded that malicious destruction of property under Massachusetts law is a CIMT and that Palmeira was therefore statutorily barred from establishing eligibility for cancellation of removal. Palmeira appealed to the BIA, which issued an opinion agreeing with the IJ's conclusion but offering its own reasoning. Palmeira then filed a timely petition for review with this court, challenging the BIA's determination that malicious destruction of property under Mass. Gen. Laws ch. 266, § 127 qualifies as a CIMT.

## II. Discussion

Though we lack jurisdiction to review the agency's discretionary or factual determinations regarding an individual's application for cancellation of removal, see 8 U.S.C. § 1252(a)(2)(B); Hasan v. Holder, 673 F.3d 26, 32 (1st Cir. 2012),

-4-

we retain jurisdiction to review "constitutional claims or questions of law," 8 U.S.C. § 1252(a)(2)(D). The parties agree that Palmeira's petition for review raises a question of law that falls within our jurisdiction.

Where, as here, "the BIA has rendered a decision with its own analysis of the question at issue, our review focuses on the BIA's decision, not the IJ's." Vásquez v. Holder, 635 F.3d 563, 565 (1st Cir. 2011). We review the BIA's legal conclusions de novo, but we afford Chevron deference to the BIA's interpretation of the Immigration and Nationality Act (INA), including its determination that a particular crime qualifies as one of moral turpitude, unless that interpretation is "arbitrary, capricious, or clearly contrary to law."[3] Idy v. Holder, 674 F.3d 111, 117 (1st Cir. 2012); see also Maghsoudi v. INS, 181 F.3d 8, 14 (1st Cir. 1999).

We begin with an overview of the meaning and import of the phrase "crime involving moral turpitude." In order to establish eligibility for cancellation of removal, an applicant must, among other things, have "been a person of good moral character" during the ten years immediately preceding his

---

[3] To be clear, we defer to the BIA's construction of the "ambiguous term 'moral turpitude,'" Hernandez-Cruz v. Holder, 651 F.3d 1094, 1106 (9th Cir. 2011), not to its interpretation of the underlying criminal statute, since "[t]he BIA has no special expertise in construing state and federal criminal statutes," id. at 1105-06.

-5-

application.[4]  8 U.S.C. § 1229b(b)(1)(B).  The applicant cannot demonstrate good moral character if he was convicted[5] of a CIMT during that ten-year period.  See id. §§ 1101(f)(3), 1182(a)(2)(A)(i)(I).

The term "moral turpitude" first appeared in a federal immigration statute in 1891.  Cabral v. INS, 15 F.3d 193, 194 (1st Cir. 1994).  Congress has never defined the phrase, but we have found that "[t]he legislative history leaves no doubt . . . that Congress left the term 'crime involving moral turpitude' to future administrative and judicial interpretation."  Id. at 195.  We have adopted the BIA's definition of a CIMT as "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general," or, in other words, "an act which is per se morally reprehensible and intrinsically wrong" and is "accompanied by a vicious motive or a corrupt mind." Maghsoudi, 181 F.3d at 14 (citation and internal quotation marks omitted); see also, e.g., Matter of Silva-Trevino, 24 I. & N. Dec.

---

[4] A cancellation of removal applicant must also establish that: (1) he has been physically present in the United States for a continuous period of not less than ten years; (2) he has not been convicted of certain enumerated crimes; and (3) his removal would result in exceptional and extremely unusual hardship to a qualifying family member.  See 8 U.S.C. § 1229b(b)(1).

[5] Palmeira concedes that his admission to sufficient facts to sustain a guilty finding, coupled with his probation sentence, constitutes a "conviction" within the meaning of 8 U.S.C. § 1101(a)(48)(A).

687, 706 (A.G. 2008) ("A finding of moral turpitude under the [INA] requires that a perpetrator have committed the reprehensible act with some form of scienter.").

The relatively amorphous nature of the moral turpitude definition has led to "a patchwork of different approaches" to the CIMT analysis among the circuit courts. Silva-Trevino, 24 I. & N. Dec. at 688. In Silva-Trevino, the Attorney General (AG) responded to that patchwork by attempting "to establish a uniform framework for ensuring that the [INA's] moral turpitude provisions are fairly and accurately applied." Id. Under the first step of the AG's three-part framework, the adjudicator must determine whether the crime at issue categorically involves moral turpitude by examining "whether there is a 'realistic probability, not a theoretical possibility,'" that the criminal statute "would be applied to reach conduct that does not involve moral turpitude." Id. at 690 (quoting Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007)). If that "categorical" approach does not resolve the issue, the adjudicator must then apply a "modified categorical" approach, by examining the record of conviction to determine whether it "evidences a crime that in fact involved moral turpitude." Id. If the modified categorical approach is not conclusive, under Silva-Trevino, an adjudicator should proceed to a third step, which

involves examining "evidence beyond the formal record of conviction."[6]  Id.

Our approach to the CIMT analysis has been generally consistent with the first two steps of the Silva-Trevino framework, though we have not specifically applied the "realistic probability" test.[7]  We have begun by looking "to the inherent nature of the crime of conviction, as defined in the criminal statute," to determine whether it fits the CIMT definition.  Idy, 674 F.3d at 118 (citation and internal quotation marks omitted).  If it does, we have said that "our inquiry may end there."  Id.  If, however, "the face of the statute is insufficient for us to make a moral-turpitude determination (e.g., if the statute contains both crimes that involve moral turpitude and crimes that do not) then we

---

[6] We need not decide today whether we will follow the third step of the AG's framework, which has proven controversial.  The Third, Fourth, Eighth, and Eleventh Circuits have rejected Silva-Trevino for its suggestion that adjudicators can look beyond the record of conviction and examine the specific facts of the offense at issue.  See Prudencio v. Holder, 669 F.3d 472, 480-84 (4th Cir. 2012); Fajardo v. U.S. Att'y Gen., 659 F.3d 1303, 1307-10 (11th Cir. 2011); Guardado-Garcia v. Holder, 615 F.3d 900, 902 (8th Cir. 2010); Jean-Louis v. Att'y Gen. of U.S., 582 F.3d 462, 470-80 (3d Cir. 2009).  Only the Seventh Circuit has thus far adopted Silva-Trevino's third prong.  See Mata-Guerrero v. Holder, 627 F.3d 256, 260-61 (7th Cir. 2010).

[7] Because the parties have not briefed the issue, and it therefore is not properly before us, we will leave for another day the question of whether to adopt the "realistic probability" test, as the Seventh, Ninth, and Tenth Circuits have done.  See Rodriguez-Heredia v. Holder, 639 F.3d 1264, 1267 (10th Cir. 2011); Mata-Guerrero, 627 F.3d at 260; Nunez v. Holder, 594 F.3d 1124, 1129 (9th Cir. 2010).

may look to the record of conviction — the indictment, plea, verdict, and sentence."  Id.

The criminal statute at issue here reads as follows:

> Whoever destroys or injures the personal property, dwelling house or building of another in any manner or by any means not particularly described or mentioned in this chapter shall, if such destruction or injury is wilful and malicious, be punished by imprisonment in the state prison for not more than ten years or by a fine of three thousand dollars or three times the value of the property so destroyed or injured, whichever is greater and imprisonment in jail for not more than two and one-half years; or if such destruction or injury is wanton, shall be punished by a fine of fifteen hundred dollars or three times the value of the property so destroyed or injured, whichever is greater, or by imprisonment for not more than two and one-half years; if the value of the property so destroyed or injured is not alleged to exceed two hundred and fifty dollars, the punishment shall be by a fine of three times the value of the damage or injury to such property or by imprisonment for not more than two and one-half months; provided, however, that where a fine is levied pursuant to the value of the property destroyed or injured, the court shall, after conviction, conduct an evidentiary hearing to ascertain the value of the property so destroyed or injured. The words "personal property", as used in this section, shall also include electronically processed or stored data, either tangible or intangible, and data while in transit.

Mass. Gen. Laws ch. 266, § 127.  The statute punishes both wanton destruction of property and malicious destruction of property. Under Massachusetts law, wanton destruction of property "requires only a showing that the actor's conduct was indifferent to, or in

disregard of, probable consequences." <u>Commonwealth</u> v. <u>Armand</u>, 580 N.E.2d 1019, 1022 (Mass. 1991). Malicious destruction of property, on the other hand, consists of conduct that is both willful and malicious. <u>See, e.g.</u>, <u>Commonwealth</u> v. <u>Morris M.</u>, 876 N.E.2d 462, 465 (Mass. App. Ct. 2007). Willful "means intentional and by design." <u>Id.</u> (citation and internal quotation marks omitted). Malicious means that the "intentional acts were done out of cruelty, hostility, or revenge" toward the owner of the property, even if the defendant did not know who the owner was. <u>Id.</u> at 466.

As we review the BIA's conclusion that malicious destruction of property under Massachusetts law is a CIMT, we have no case law directly on point to guide us.[8] The government points

---

[8] Palmeira has cited three cases involving property crimes that the BIA has concluded are not CIMTs. Each of those cases is distinguishable because the underlying statute encompassed conduct less severe than the willful and malicious conduct required by Mass. Gen. Laws ch. 266, § 127. <u>See, e.g.</u>, <u>In the Matter of B</u>, 2 I. & N. Dec. 867, 868 (BIA 1947) (willfully damaging mailboxes and other property under Canadian law "may or may not involve moral turpitude dependent upon the degree of negligence manifested"); <u>In the Matter of C</u>, 2 I. & N. Dec. 716, 719 (BIA 1947) (damaging private property under Canadian law is not a CIMT because "[t]here is no malice involved"); <u>Matter of M</u>, 2 I. & N. Dec. 686, 691 (BIA 1946) (unlawful destruction of railway telegraph property under Canadian law is not a CIMT because "the statute does not require that the proscribed act be accompanied by a vicious or corrupt intent").

Also distinguishable, though the parties have failed to cite it, is the Ninth Circuit's decision in <u>Rodriquez-Herrera</u> v. <u>INS</u>, 52 F.3d 238 (9th Cir. 1995), holding that second-degree malicious mischief under Washington law is not a CIMT. In that case, the state statute provided that a person was guilty of malicious mischief if he "knowingly and maliciously . . . cause[d] physical damage to the property of another in an amount exceeding two hundred fifty dollars." <u>Id.</u> at 239 (citation and internal

-10-

to In the Matter of M, 3 I. & N. Dec. 272 (BIA 1948), in which the BIA found that a conviction for malicious destruction of property under Oregon law qualified as a CIMT. In that case, the petitioner had slaughtered another man's hogs with an axe. Id. at 273. The BIA emphasized that the Oregon statute "require[d] a motive . . . manifested by the elements of malice and wantonness." Id. at 274. Drawing on that language, the government reads Matter of M as standing for the broad principle that destruction of property is always a CIMT where a showing of malicious intent is required. But Matter of M predated the categorical approach; the BIA thus ultimately looked at the particular facts of the petitioner's crime and determined that it was base, vile, and depraved. Id. Today, under the categorical approach, we must examine only the inherent nature of the criminal statute; "the particular circumstances of [the defendant's] acts and convictions" are off-limits. Maghsoudi, 181 F.3d at 14. Because the BIA's holding in Matter of M was

---

quotation marks omitted). "Maliciously" was defined under Washington law as "import[ing] an evil intent, wish, or design to vex, annoy, or injure another person." Id. (citation and internal quotation marks omitted). Importantly, however, malice could also "be inferred if the act [was] merely wrongfully done without just cause or excuse," id. at 240 (citation and internal quotation marks omitted), which led the Ninth Circuit to conclude that the statute might apply to "pranksters with poor judgment," id. That is not the case here. The Massachusetts courts have explicitly held, with regard to violations of Mass. Gen. Laws ch. 266, § 127, that malice cannot be "inferred from the wilful commission of an unlawful act without excuse." Morris M., 876 N.E.2d at 465. "In addition to the intent to inflict injury to property, the crime requires a state of mind infused with cruelty, hostility or revenge." Commonwealth v. Redmond, 757 N.E.2d 249, 252 (Mass. App. Ct. 2001).

dependent upon the facts of that case, and the BIA was not purporting to decide that malicious destruction of property categorically involves moral turpitude, we find Matter of M to be of limited value.

Against that backdrop, we turn to the BIA's decision in this case. The BIA began by applying the categorical approach and determined that Mass. Gen. Laws ch. 266, § 127 is a divisible statute, because it punishes both malicious and wanton destruction of property. The BIA found that wanton destruction of property is not categorically a CIMT, because it may be done with indifference or recklessly. The BIA then moved to the modified categorical approach, examined Palmeira's record of conviction, and determined that his conviction was of the malicious variety (a finding that Palmeira does not contest). Because, under Massachusetts law, a malicious act must be done with "a state of mind of cruelty, hostility or revenge," Morris M., 876 N.E.2d at 465 (citation and internal quotation marks omitted), the BIA agreed with the IJ that malicious destruction of property is a CIMT. The BIA cited two of its cases standing for the proposition that "an analysis of an alien's intent is critical to a determination regarding moral turpitude." In re Fualaau, 21 I. & N. Dec. 475, 478 (BIA 1996); see also Matter of Franklin, 20 I. & N. Dec. 867, 868 (BIA 1994) ("Among the tests to determine if a crime involves moral turpitude

-12-

is whether the act is accompanied by a vicious motive or a corrupt mind.").

The BIA's analysis could certainly have been more thorough, but the agency did not reach an unreasonable conclusion. Idy, 674 F.3d at 117. Palmeira's primary argument on appeal is that "there is no requirement [under Mass. Gen. Laws ch. 266, § 127] that [the defendant] have malice toward the owner of the property nor toward any other person," and hostility toward an inanimate object is not enough to render a crime morally turpitudinous. Massachusetts case law, however, directly contradicts Palmeira's claim. The Massachusetts courts have required evidence of an act "by design hostile to the owner (even if unknown) of the property," meaning that the defendant need not know the owner's identity but must be motivated by "cruelty, hostility, or revenge" toward an individual, not just an inanimate object. Morris M., 876 N.E.2d at 466 (finding insufficient evidence to establish that the defendant was "motivated by hostility, cruelty, or vengeance toward [the property's] owner"); see also, e.g., Commonwealth v. Tawfik, No. 04-P-1411, 2005 WL 2400286, at *2 (Mass. App. Ct. Sept. 29, 2005) (finding that the defendant's charged acts were "committed with the requisite malice" because they "were motivated by hostility toward the [property owner]"); Commonwealth v. McGovern, 494 N.E.2d 1298, 1301 (Mass. 1986) (finding sufficient evidence that "the defendant's

destructive acts . . . were hostile to the owner of the [property]"). A mindset of "cruelty, hostility, or revenge" toward an individual satisfies the "vicious motive or . . . corrupt mind" requirement of the CIMT definition. Maghsoudi, 181 F.3d at 14.

Of course, in order to qualify as a CIMT, malicious destruction of property must also involve an act that is "per se morally reprehensible and intrinsically wrong." Id. This statute, unlike others we have examined in the CIMT context, does not require any risk of physical harm to another person, which can render conduct inherently reprehensible. See Idy, 674 F.3d at 119 (reckless conduct under New Hampshire law "is necessarily reprehensible because its definition includes an aggravating factor — 'serious bodily injury'"); Nguyen v. Reno, 211 F.3d 692, 695 (1st Cir. 2000) (assault in the second degree under Connecticut law is a CIMT because it requires "serious physical injury"); cf. Maghsoudi, 181 F.3d at 14-15 (indecent assault under Massachusetts law is a CIMT); Cabral, 15 F.3d at 195-97 (being an accessory after the fact to voluntary murder under Massachusetts law is a CIMT). Nor does the crime involve fraudulent conduct. See Jordan v. De George, 341 U.S. 223, 232 (1951) ("The phrase 'crime involving moral turpitude' has without exception been construed to embrace fraudulent conduct."). But Palmeira has given us no reason to doubt the BIA's conclusion that an intentional, destructive act committed with malice (that is to say, out of cruelty, hostility,

-14-

or revenge) toward an individual is necessarily "reprehensible" and thus satisfies the CIMT definition.  Maghsoudi, 181 F.3d at 14.

Indeed, the cases Palmeira has cited as involving acts that do not, in his opinion, rise to the level of a CIMT only underscore the reasonableness of the BIA's decision.  In McGovern, the defendant broke into a parking lot booth, was observed "tearing it apart," and caused extensive damage, including breaking a window, knocking in a door, pulling electrical wiring off the ceiling of the booth, and throwing various items onto the street. 494 N.E.2d at 1299.  In Commonwealth v. Cimino, 611 N.E.2d 738 (Mass. App. Ct. 1993), the defendant went on a "shooting round," during which he and a group of his friends took turns shooting a BB gun at (and thereby breaking) the windows of seventeen parked cars, id. at 740.  Because the defendant and his accomplices had deliberately "aimed the BB pistol and hit their targets," the court found the crime "wilful and malicious."  Id. at 741.  The conduct at issue in McGovern and Cimino could reasonably be classified as "morally reprehensible and intrinsically wrong."  Maghsoudi, 181 F.3d at 14; see also Idy, 674 F.3d at 117.

One can certainly argue that destroying property, even with an evil mindset, is not necessarily "base, vile, or depraved" behavior, or the sort of crime that should render an individual deportable.  But that determination is not ours to make on a de novo basis; we must defer to the BIA's conclusion that a crime

-15-

involves moral turpitude if that conclusion "is neither arbitrary nor contrary to law." Idy, 674 F.3d at 119. Malicious destruction of property in Massachusetts requires "gratuitous, excessive violence purposefully designed to intimidate and overpower, or destructive acts that were by design and hostile to the owner of the property, whoever that may have been." Commonwealth v. Redmond, 757 N.E.2d 249, 253 (Mass. App. Ct. 2001) (internal citation and quotation marks omitted). That is a high bar; the BIA's conclusion that such conduct necessarily implicates moral turpitude was "neither arbitrary nor contrary to law." Idy, 674 F.3d at 119.

### III. Conclusion

We find no particular satisfaction in our conclusion today. It is unfortunate that Palmeira admitted to sufficient facts to support a finding of malicious destruction of property under the misapprehension that doing so would allow him to avoid the very immigration consequences that he now faces. There is also, as the BIA recognized, a real potential for hardship in this case, given that Palmeira has two United States citizen children who may soon be separated from their father. But because the BIA's conclusion was a reasonable interpretation of the INA, we deny Palmeira's petition for review. Id.

-16-