# United States Court of Appeals
## For the First Circuit

No. 16-1033

WESCLEY FONSECA PEREIRA,

Petitioner,

v.

JEFFERSON B. SESSIONS III,[*]
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Lipez, and Thompson,
<u>Circuit Judges</u>.

Jeffrey B. Rubin, with whom Rubin Pomerleau P.C. was on brief, for petitioner.
Sarah K. Pergolizzi, Trial Attorney, Office of Immigration Litigation, with whom Bejamin C. Mizer, Acting Assistant Attorney General, Civil Division, Kohsei Ugumori, Senior Litigation Counsel, Office of Immigration Litigation, and Jesse D. Lorenz, Trial Attorney, Office of Immigration Litigation, were on brief, for respondent.

_____

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Jefferson B. Sessions III has been substituted for former Attorney General Loretta E. Lynch as respondent.

July 31, 2017

**LIPEZ**, **Circuit Judge**.  The Immigration and Nationality Act ("INA") gives the Attorney General discretion to cancel the removal of a non-permanent resident alien if the alien meets certain criteria, including ten years of continuous physical presence in the United States.  8 U.S.C. § 1229b(b)(1).  Under the "stop-time" rule, the alien's period of continuous physical presence ends "when the alien is served a notice to appear under section 1229(a)" of the INA.  Id. § 1229b(d)(1).  In this case, we must decide whether a notice to appear that does not contain the date and time of the alien's initial hearing is nonetheless effective to end the alien's period of continuous physical presence.  The Board of Immigration Appeals ("BIA") answered this question affirmatively in Matter of Camarillo, 25 I. & N. Dec. 644 (B.I.A. 2011).  The BIA applied that rule in this case.

Joining the majority of circuit courts to address this issue, we conclude that the BIA's decision in Camarillo is entitled to Chevron deference.  We deny the petition for review.

## I.

Wescley Fonseca Pereira ("Pereira"), a native and citizen of Brazil, was admitted to the United States in June 2000 as a non-immigrant visitor authorized to stay until December 21, 2000.  He overstayed his visa.  In May 2006, less than six years after Pereira entered the country, the Department of Homeland Security ("DHS") personally served him with a notice to appear.

The notice did not specify the date and time of his initial removal hearing, but instead ordered him to appear before an Immigration Judge ("IJ") in Boston "on a date to be set at a time to be set." More than a year later, DHS filed the notice to appear with the immigration court, and the court mailed Pereira a notice setting his initial removal hearing for October 31, 2007 at 9:30 A.M. Because the notice was sent to Pereira's street address on Martha's Vineyard rather than his post office box, however, he never received it.[1] When Pereira failed to appear at the hearing, an IJ ordered him removed in absentia.

Pereira was not removed, however, and he remained in the country. In March 2013, more than five years later, Pereira was arrested for a motor vehicle violation and detained by DHS. Pereira retained an attorney, who filed a motion to reopen his removal proceedings, claiming that Pereira had never received the October 2007 hearing notice. After an IJ allowed the motion, Pereira conceded removability, but sought relief in the form of cancellation of removal under 8 U.S.C. § 1229b(b)(1).[2] Arguing

---

[1] According to Pereira, such a problem is not uncommon for residents of Martha's Vineyard, who often receive mail through a post office box rather than at their home addresses.

[2] Pereira also applied for voluntary departure, a request that he later withdrew. In addition, he asked DHS to exercise its prosecutorial discretion to allow him to remain in the country with his wife and two American citizen daughters. DHS denied that request.

- 4 -

that the notice to appear was defective because it did not include the date and time of his hearing, Pereira contended that it had not "stopped" the continuous residency clock. He asserted that he had instead continued to accrue time for the purpose of § 1229b(b)(1) until he received a notice of the hearing that occurred after his case was reopened in 2013.

The IJ pretermitted Pereira's application for cancellation of removal, finding that Pereira could not establish the requisite ten years of continuous physical presence, and ordered him removed. Pereira appealed to the BIA. On appeal, he conceded that Camarillo foreclosed his argument that the stop-time rule did not cut off his period of continuous physical presence until 2013, but argued that Camarillo should be reconsidered and overruled. The BIA declined to reconsider Camarillo and affirmed the IJ's decision, holding that the notice to appear was effective under the stop-time rule despite the missing details concerning the date and time of his hearing.[3] Pereira timely filed a petition for review with this court.

---

[3] Pereira also asked the BIA to administratively close his case, or to remand it to the IJ to consider termination or administrative closure while he submitted a second application to DHS seeking prosecutorial discretion, this time pursuant to a recently announced program. The BIA denied Pereira's request, stating that DHS had sole authority over prosecutorial discretion decisions and that prosecutorial discretion did not, therefore, provide a basis upon which the BIA could remand or administratively close the case.

## II.

**A. Standard of Review**

Because "the BIA adopted and affirmed the IJ's ruling, and discussed some of the bases for the IJ's opinion, we review both the BIA's and IJ's opinions." Idy v. Holder, 674 F.3d 111, 117 (1st Cir. 2012). Where, as here, the case presents a question of statutory interpretation, we review the BIA's legal conclusions de novo, but give "appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Id. (quoting Gailius v. INS, 147 F.3d 34, 43 (1st Cir. 1998)). Under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., we first look to the statutory text to ascertain whether "Congress has directly spoken to the precise question at issue." 467 U.S. 837, 842 (1984). If the statute addresses the question at issue and is clear in its meaning, then we "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If, however, the statute is silent or ambiguous, we determine "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. We defer to an agency's construction of an ambiguous statutory provision "unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" Saysana v. Gillen, 590 F.3d 7, 13 (1st Cir. 2009) (quoting Chevron, 467 U.S. at 844).

**B. Analysis**

### 1. Chevron Step One: Ambiguity of the Statute

To qualify for cancellation of removal, an alien must meet several criteria, including a showing that he "has been physically present in the United States for a continuous period of not less than 10 years." 8 U.S.C. § 1229b(b)(1)(A). We focus on the language of the stop-time rule, 8 U.S.C. § 1229b(d)(1), which cuts off that period of physical presence "when the alien is served a notice to appear under section 1229(a)."[4]

The referenced provision, § 1229(a), contains three subsections, the first of which states:

> In removal proceedings under section 1229a of this title, written notice (in this section referred to as a "notice to appear") shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following: . . . .

---

[4] The full text of the provision reads:

(1) Termination of continuous period

For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) except in the case of an alien who applies for cancellation of removal under subsection (b)(2), when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest.

8 U.S.C. § 1229b(d)(1).

Id. § 1229(a)(1).  That subsection goes on to specify ten items, including the charges against the alien, the alien's alleged illegal conduct, and "[t]he time and place at which the proceedings will be held."  Id.  The second subsection provides a procedure for notifying the alien in the event of a change in the time or place of the initial removal hearing.  See id. § 1229(a)(2).  The third subsection directs the Attorney General to "create a system to record and preserve" the addresses and telephone numbers of aliens who have been served with notices to appear.  Id. § 1229(a)(3).

Pereira argues that the stop-time rule's reference to "a notice to appear under § 1229(a)" unambiguously requires that the notice include all of the information specified in § 1229(a)(1), including the date and time of the initial removal hearing. Otherwise, he claims, the notice is not, in fact, a "notice to appear," and it cannot trigger the stop-time rule.  According to Pereira, however, all ten items listed in § 1229(a)(1) need not be provided in the same document.  Instead, two or more documents that together contain all ten items (such as the notice served on Pereira in 2006 and the hearing notice he received in 2013) could, in combination, serve as a "notice to appear."  In that case, the stop-time rule would not be triggered until both documents had been served on the alien.

For support, Pereira cites a recent decision by the Third Circuit, which found that the language of § 1229b(d)(1) unambiguously requires that the date and time of the hearing be provided before the stop-time rule is triggered. See Orozco-Velasquez v. Att'y Gen. United States, 817 F.3d 78, 81-82 (3d Cir. 2016). The court relied upon § 1229(a)(1)'s commandment that a notice to appear specifying the ten pieces of information listed "shall be given in person to the alien." Id. at 83. Explaining that the word "shall" "conveys a mandatory rather than a hortatory instruction," the court concluded that only a notice or set of notices that "conveys the complete set of information prescribed by § 1229(a)(1)" could "stop the continuous residency clock." Id.

The word "shall," however, appears in § 1229(a)(1), not in the stop-time rule itself. It is undisputed that § 1229(a)(1) creates a duty requiring the government to provide an alien with the information listed in that provision. But whether a notice to appear that omits some of this information nonetheless triggers the stop-time rule is a different question. As the Seventh Circuit has observed, even if such an omission renders a notice to appear defective, "a defective document [may] nonetheless serve[] a useful purpose." Wang v. Holder, 759 F.3d 670, 674 (7th Cir. 2014); see also Gonzalez-Garcia v. Holder, 770 F.3d 431, 435 (6th Cir. 2014) (quoting Wang, 759 F.3d at 674). In Becker v. Montgomery, the Supreme Court held that an unsigned notice of

- 9 -

appeal could qualify as timely filed, even if the missing signature was not provided within the filing period.  532 U.S. 757, 760 (2001).  Here, just as there, the missing item may be a "curable" defect that does not prevent the notice from serving its purpose.[5]

We thus disagree with the Third Circuit's holding that the stop-time rule unambiguously incorporates the requirements of § 1229(a)(1).  The stop-time rule does not explicitly state that the date and time of the hearing must be included in a notice to appear in order to cut off an alien's period of continuous physical presence.  See 8 U.S.C. § 1229b(d)(1).  Moreover, the rule's reference to a notice to appear "under" § 1229(a) does not clearly indicate whether the rule incorporates the requirements of that section.  See id.  Thus, we find the statutory language of the stop-time rule ambiguous.  Pereira cannot, therefore, prevail at the first step of the Chevron inquiry, and we must proceed to step two.

---

[5] Pereira also cites Orozco-Velasquez for the argument that "[t]aken to its logical conclusion, the agency's approach might treat even a 'notice to appear' containing no information whatsoever as a 'stop-time' trigger."  817 F.3d at 84.  Because the facts of this case involve only an initially omitted, but later provided, hearing date, and the BIA's opinion made no assertions about the extension of Camarillo to other contexts, this case does not require us to define the boundaries of our deference to the agency's statutory construction of the applicable provisions. See, e.g., López-Soto v. Hawayek, 175 F.3d 170, 177 (1st Cir. 1999) (explaining that the facts of the case presented "no occasion to address . . . looming issues" that might become relevant in other contexts).

- 10 -

**2. Chevron Step Two: Permissibility of the Agency's Interpretation**

The BIA's decision in this case relied on its precedential opinion in Camarillo, in which the BIA announced its position on the statutory question we face here. See 25 I. & N. Dec. at 645. Finding more than one plausible interpretation of the stop-time rule, the BIA in Camarillo determined that the statutory language was ambiguous. Id. at 647. The agency explained that, instead of incorporating the requirements of § 1229(a) as Pereira suggests here, the rule's reference to "a notice to appear under section 1229(a)" could also be construed as "simply definitional." Id. That is, the reference may "merely specif[y] the document the DHS must serve on the alien to trigger the 'stop-time' rule," without "impos[ing] substantive requirements for a notice to appear to be effective" in triggering that rule. Id.

After examining the structure of the statute, the administration of the statute's requirements, and the statute's legislative history, the agency concluded that the "definitional" construction of the stop-time rule was the better reading. Id. at 651. The BIA applied that holding from Camarillo in this case. We are obligated to defer to the BIA as long as its chosen construction is not "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 457 U.S. at 844. We thus must determine

- 11 -

whether the BIA adopted a permissible construction of the stop-time rule.

### a. Statutory Structure

In Camarillo, the agency began its analysis by examining the structure of the INA and, more specifically, the relevant provisions. It noted that § 1229(a) is "the primary reference in the [INA] to the notice to appear," and that this section defines the term "notice to appear." Camarillo, 25 I. & N. Dec. at 647. Thus, the BIA explained, it seems logical that Congress would reference § 1229(a) "to specify the document the DHS must serve on the alien to trigger the 'stop-time' rule," supporting a "definitional" reading of the reference. Id.

Looking to the language of the stop-time rule, the BIA then noted that the rule refers not just to § 1229(a)(1), the provision specifying the information that must be included in a notice to appear, but instead it broadly references the entirety of § 1229(a). Id.; see also 8 U.S.C. § 1229b(d)(1). As noted above, the second subsection of § 1229(a) "outlin[es] the procedures [for DHS] to follow when notice must be given" of changes in the date or time of the initial removal hearing. Camarillo, 25 I. & N. Dec. at 647-48; see also § 1229(a)(2). This provision "clearly accounts for [the] reality" that such details "are often subject to change," and "indicates that Congress envisioned that . . . notification [of a change in hearing date]

could occur after the issuance of the notice to appear." Camarillo, 25 I. & N. Dec. at 647-48.

We agree with the thrust of the BIA's reasoning. It would make little sense for the stop-time rule's reference to "a notice to appear under section 1229(a)" to condition the triggering of the rule on the fulfillment of all of the requirements of § 1229(a), which include not just notification of the initial date and time of the removal hearing under § 1229(a)(1), but also notification of any subsequent changes to that date and time under § 1229(a)(2).[6]

#### b. Administrative Context

The BIA further reasoned that the "definitional" approach best accords with the process through which enforcement proceedings are initiated. While DHS drafts and serves the notice to appear, the immigration court sets the date and time of the hearing. See id. at 648, 650; see also 8 C.F.R. § 1003.18. The BIA observed that because "DHS frequently serves [notices to appear] where there is no immediate access to docketing information," Camarillo, 25 I. & N. Dec. at 648 (alteration in original) (quoting Dababneh v. Gonzales, 471 F.3d 806, 809 (7th Cir. 2006)), "it is often not practical to include the date and

---

[6] Notably, Pereira neither addresses whether the stop-time rule incorporates § 1229(a)(2) and (a)(3), nor argues that the rule somehow incorporates only the requirements of § 1229(a)(1).

time of the initial removal hearing on the notice to appear," id. An interpretation of the statute that allows the stop-time rule to take effect without requiring separate action by the immigration courts would, therefore, accommodate these practical constraints.

### c. Legislative History

The BIA also relied upon the legislative history of the stop-time rule. The rule was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, which amended various portions of the INA. Before the enactment of the stop-time rule, the agency explained, "[an] otherwise eligible person could qualify for suspension of deportation [now known as "cancellation of removal"] if he or she had been continuously physically present in the United States for [the requisite period], regardless of whether or when the Immigration and Naturalization Service had initiated deportation proceedings against the person through the issuance of" the document that, at that time, served as a notice to appear. Camarillo, 25 I. & N. Dec. at 649-50 (first alteration in original) (quoting Matter of Nolasco, 22 I. & N. Dec. 632, 640 (B.I.A. 1999) (quoting 143 Cong. Rec. S12265, S12266 (daily ed. Nov. 9, 1997))). "[T]he 'stop-time' rule was enacted to address 'perceived abuses arising from'" this legal loophole by "prevent[ing] aliens from being able 'to "buy time[]" [through tactics such as requesting multiple continuances,] during which

they could acquire a period of continuous presence that would qualify them for forms of relief that were unavailable to them when proceedings were initiated.'" Id. at 649 (quoting Matter of Cisneros, 23 I. & N. Dec. 668, 670 (B.I.A. 2004) (quoting H.R. Rep. 104-469, pt. I, at 122 (1996))). Thus, the BIA concluded, "Congress intended for the 'stop-time' rule to break an alien's continuous physical residence or physical presence in the United States when . . . DHS[] serves the charging document," regardless of whether that document contains a hearing date. Id. at 650.

The legislative history reflects Congress's concern about delay and inefficiency in the immigration process that it sought to address through the enactment of IIRIRA. Specifically, a report of the Judiciary Committee of the House of Representatives notes that "lapses (perceived or genuine) in the procedures for notifying aliens of deportation proceedings [had led] some immigration judges to decline to exercise their authority to order an alien deported in absentia." H.R. Rep. 104-469, pt. I, at 122. The creation of the "notice to appear" was intended to prevent "protracted disputes concerning whether an alien has been provided proper notice of a proceeding" by informing aliens that they are required to notify the government of any changes in their contact information. Id. at 159; see 8 U.S.C. § 1229(a)(1)(F) (stating that a notice to appear shall include "[t]he requirement that the alien must immediately provide (or have provided) the Attorney

- 15 -

General with a written record of an address and telephone number (if any) at which the alien may be contacted" and "[t]he requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number"). Given Congress's intent in enacting IIRIRA to prevent notice problems from dragging out the deportation process, it would make little sense for Congress to have created the potential for further delays by conditioning the activation of the stop-time rule on the receipt of a hearing notice that may come months, or even years, after the initiation of deportation proceedings by DHS.

### d. Conclusion

In light of the relevant text, statutory structure, administrative context, and legislative history, the BIA's construction of the stop-time rule is neither arbitrary and capricious nor contrary to the statute. See Chevron, 467 U.S. at 844. It is thus a permissible construction of the statute to which we defer.[7] See id. In so holding, we join five other circuits that have granted Chevron deference to the BIA's interpretation in

---

[7] To the extent the government suggests that our holding is dictated by Cheung v. Holder, 678 F.3d 66 (1st Cir. 2012), Pereira correctly points out that the notice to appear in that case was not alleged to have omitted any of the required information. Instead, Cheung addressed the application of the stop-time rule when the government later withdraws the charges stated in the notice and substitutes a different set of charges. See 678 F.3d at 69. Thus, that precedent is not controlling.

published opinions.[8]  See Guaman-Yuqui v. Lynch, 786 F.3d 235, 240 (2d Cir. 2015) (per curiam); Moscoso-Castellanos v. Lynch, 803 F.3d 1079, 1083 (9th Cir. 2015);[9] Gonzalez-Garcia, 770 F.3d at 434-35; Wang, 759 F.3d at 675; Urbina v. Holder, 745 F.3d 736, 740 (4th Cir. 2014).  But see Orozco-Velasquez, 817 F.3d at 82-83.

## III.

Because we defer to the BIA's interpretation of the stop-time rule, we agree with the agency's conclusion that Pereira's period of continuous physical presence ended when he was served with a notice to appear in 2006.  At that point, he had been present in the United States for less than six years.  Unable to demonstrate the requisite ten years of physical presence, Pereira is ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(1).  The petition for review is denied.

So ordered.

---

[8] The Eleventh Circuit also granted the BIA's construction Chevron deference in an unpublished opinion, see O'Garro v. U.S. Att'y Gen., 605 F. App'x 951, 953 (11th Cir. 2015) (per curiam), and accepted the BIA's construction without conducting a Chevron analysis in Hernandez-Rubio v. U.S. Att'y Gen., 615 F. App'x 933, 934 (11th Cir. 2015) (per curiam).

[9] Pereira cites Garcia-Ramirez v. Gonzales, a pre-Camarillo case in which the Ninth Circuit held, in a footnote, that the petitioner's period of continuous physical presence did not end until she was served with a notice containing the date and time of her hearing.  423 F.3d 935, 937 n.3 (9th Cir. 2005) (per curiam). Because that court later afforded Chevron deference to the BIA's interpretation in Camarillo, however, Garcia-Ramirez no longer states the applicable law in the Ninth Circuit.  See Moscoso-Castellanos, 803 F.3d at 1082 n.2.

- 17 -