(Slip Opinion) OCTOBER TERM, 2017 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PEREIRA *v.* SESSIONS, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 17–459. Argued April 23, 2018—Decided June 21, 2018

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), nonpermanent residents who are subject to removal proceedings may be eligible for cancellation of removal if, among other things, they have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application" for cancellation. 8 U. S. C. §1229(b)(1)(A). Under the stop-time rule, however, the period of continuous presence is "deemed to end . . . when the alien is served a notice to appear under section 1229(a)." §1229(d)(1)(A). Section 1229(a), in turn, provides that the Government shall serve noncitizens in removal proceedings with a written "'notice to appear,'" specifying, among other things, "[t]he time and place at which the [removal] proceedings will be held." §1229(a)(1)(G)(i). Per a 1997 regulation stating that a "notice to appear" served on a noncitizen need only provide "the time, place and date of the initial removal hearing, where practicable," 62 Fed. Reg. 10332, the Department of Homeland Security (DHS), at least in recent years, almost always serves noncitizens with notices that fail to specify the time, place, or date of initial removal hearings whenever the agency deems it impracticable to include such information. The Board of Immigration Appeals (BIA) has held that such notices trigger the stop-time rule even if they do not specify the time and date of the removal proceedings.

Petitioner Wescley Fonseca Pereira is a native and citizen of Brazil who came to the United States in 2000 and remained after his visa expired. Following a 2006 arrest for operating a vehicle while under the influence of alcohol, DHS served Pereira with a document titled "notice to appear" that did not specify the date and time of his initial

removal hearing, instead ordering him to appear at a time and date
to be set in the future. More than a year later, in 2007, the Immigra-
tion Court mailed Pereira a more specific notice setting the date and
time for his initial hearing, but the notice was sent to the wrong ad-
dress and was returned as undeliverable. As a result, Pereira failed
to appear, and the Immigration Court ordered him removed in absen-
tia.

In 2013, Pereira was arrested for a minor motor vehicle violation
and detained by DHS. The Immigration Court reopened the removal
proceedings after Pereira demonstrated that he never received the
2007 notice. Pereira then applied for cancellation of removal, argu-
ing that he had been continuously present in the United States for
more than 10 years and that the stop-time rule was not triggered by
DHS' initial 2006 notice because the document lacked information
about the time and date of his removal hearing. The Immigration
Court disagreed and ordered Pereira removed. The BIA agreed with
the Immigration Court that the 2006 notice triggered the stop-time
rule, even though it failed to specify the time and date of Pereira's in-
itial removal hearing. The Court of Appeals for the First Circuit de-
nied Pereira's petition for review of the BIA's order. Applying the
framework set forth in *Chevron U. S. A. Inc.* v. *Natural Resources De-
fense Council, Inc.,* 467 U. S. 837, it held that the stop-time rule is
ambiguous and that the BIA's interpretation of the rule was a per-
missible reading of the statute.

*Held*: A putative notice to appear that fails to designate the specific
time or place of the noncitizen's removal proceedings is not a "notice
to appear under §1229(a)," and so does not trigger the stop-time rule.
Pp. 7–20.

(a) The Court need not resort to *Chevron* deference, for the unam-
biguous statutory text alone is enough to resolve this case. Under the
stop-time rule, "any period of . . . continuous physical presence" is
"deemed to end . . . when the alien is served a notice to appear under
section 1229(a)." 8 U. S. C. §1229b(d)(1). By expressly referencing
§1229(a), the statute specifies where to look to find out what "notice
to appear" means. Section 1229(a), in turn, clarifies that the type of
notice "referred to as a 'notice to appear' " throughout the statutory
section is a "written notice . . . specifying," as relevant here, "[t]he
time and place at which the [removal] proceedings will be held."
§1229(a)(1)(G)(i). Thus, to trigger the stop-time rule, the Govern-
ment must serve a notice to appear that, at the very least,
"specif[ies]" the "time and place" of the removal hearing.

The Government and dissent point out that the stop-time rule re-
fers broadly to a notice to appear under "§1229(a)"—which includes
paragraph (1), as well as paragraphs (2) and (3). But that does not

matter, because only paragraph (1) bears on the meaning of a "notice to appear." If anything, paragraph (2), which allows for a "change or postponement" of the proceedings to a "new time and place," §1229(a)(2)(A)(i), bolsters the Court's interpretation of the statute because the provision presumes that the Government has already served a "notice to appear" that specified a time and place as required by §1229(a)(1)(G)(i). Another neighboring provision, §1229(b)(1), lends further support for the view that a "notice to appear" must specify the time and place of removal proceedings to trigger the stop-time rule. Section 1229(b)(1) gives a noncitizen "the opportunity to secure counsel before the first [removal] hearing date" by mandating that such "hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear." For that provision to have any meaning, the "notice to appear" must specify the time and place that the noncitizen, and his counsel, must appear at the removal proceedings. Finally, common sense reinforces the conclusion that a notice that does not specify when and where to appear for a removal proceeding is not a "notice to appear" that triggers the stop-time rule. After all, an essential function of a "notice to appear" is to provide noncitizens "notice" of the information (*i.e.*, the "time" and "place") that would enable them "to appear" at the removal hearing in the first place. Without conveying such information, the Government cannot reasonably expect noncitizens to appear for their removal proceedings. Pp. 7–13.

   (b) The Government and the dissent advance a litany of counterarguments, all of which are unpersuasive. To begin, the Government mistakenly argues that §1229(a) is not definitional. That is wrong. Section 1229(a) speaks in definitional terms, requiring that a notice to appear specify, among other things, the "time and place at which the proceedings will be held." As such, the dissent is misguided in arguing that a defective notice to appear, which fails to specify time-and-place information, is still a notice to appear for purposes of the stop-time rule. Equally unavailing is the Government's (and the dissent's) attempt to generate ambiguity in the statute based on the word "under." In light of the plain language and statutory context, the word "under," as used in the stop-time rule, clearly means "in accordance with" or "according to" because it connects the stop-time trigger in §1229b(d)(1) to a "notice to appear" that specifies the enumerated time-and-place information. The Government fares no better in arguing that surrounding statutory provisions reinforce its preferred reading of the stop-time rule, as none of those provisions supports its atextual interpretation. Unable to root its reading in the statutory text, the Government and dissent raise a number of practical concerns, but those concerns are meritless and do not justify de-

Syllabus

parting from the statute's clear text. In a final attempt to salvage its atextual interpretation, the Government turns to the alleged statutory purpose and legislative history of the stop-time rule. Even for those who consider statutory purpose and legislative history, however, neither supports the Government's position. Requiring the Government to furnish time-and-place information in a notice to appear is entirely consistent with Congress' stated objective of preventing noncitizens from exploiting administrative delays to accumulate lengthier periods of continuous precedent. Pp. 13–20.

866 F. 3d 1, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, KAGAN, and GORSUCH, JJ., joined. KENNEDY, J., filed a concurring opinion. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–459

_____

## WESCLEY FONSECA PEREIRA, PETITIONER *v.* JEFFERSON B. SESSIONS, III, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 21, 2018]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Nonpermanent residents, like petitioner here, who are subject to removal proceedings and have accrued 10 years of continuous physical presence in the United States, may be eligible for a form of discretionary relief known as cancellation of removal. 8 U. S. C. §1229b(b)(1). Under the so-called "stop-time rule" set forth in §1229b(d)(1)(A), however, that period of continuous physical presence is "deemed to end . . . when the alien is served a notice to appear under section 1229(a)." Section 1229(a), in turn, provides that the Government shall serve noncitizens in removal proceedings with "written notice (in this section referred to as a 'notice to appear') . . . specifying" several required pieces of information, including "[t]he time and place at which the [removal] proceedings will be held." §1229(a)(1)(G)(i).[1]

The narrow question in this case lies at the intersection

_____

[1] The Court uses the term "noncitizen" throughout this opinion to refer to any person who is not a citizen or national of the United States. See 8 U. S. C. §1101(a)(3).

of those statutory provisions. If the Government serves a noncitizen with a document that is labeled "notice to appear," but the document fails to specify either the time or place of the removal proceedings, does it trigger the stop-time rule? The answer is as obvious as it seems: No. A notice that does not inform a noncitizen when and where to appear for removal proceedings is not a "notice to appear under section 1229(a)" and therefore does not trigger the stop-time rule. The plain text, the statutory context, and common sense all lead inescapably and unambiguously to that conclusion.

## I

## A

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546, the Attorney General of the United States has discretion to "cancel removal" and adjust the status of certain nonpermanent residents. §1229b(b). To be eligible for such relief, a nonpermanent resident must meet certain enumerated criteria, the relevant one here being that the noncitizen must have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application" for cancellation of removal. §1229b(b)(1)(A).[2]

IIRIRA also established the stop-time rule at issue in this case. Under that rule, "any period of . . . continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title."[3] §1229b(d)(1)(A). Section

_____

[2] Lawful permanent residents also may be eligible for cancellation of removal if, *inter alia*, they have continuously resided in the United States for at least seven years. §1229b(a)(2).

[3] The period of continuous physical presence also stops if and when "the alien has committed" certain enumerated offenses that would

1229(a), in turn, provides that "written notice (in this section referred to as a 'notice to appear') shall be given . . . to the alien . . . specifying":

> "(A) The nature of the proceedings against the alien.
> "(B) The legal authority under which the proceedings are conducted.
> "(C) The acts or conduct alleged to be in violation of law.
> "(D) The charges against the alien and the statutory provisions alleged to have been violated.
> "(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) of this section and (ii) a current list of counsel prepared under subsection (b)(2) of this section.
> "(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 1229a of this title.
> "(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.
> "(iii) The consequences under section 1229a(b)(5) of this title of failure to provide address and telephone information pursuant to this subparagraph.
> **"(G)(i) The time and place at which the [removal] proceedings will be held.**
> "(ii) The consequences under section 1229a(b)(5) of this title of the failure, except under exceptional cir-

---

constitute grounds for removal or inadmissibility.   §1229b(d)(1)(B). That provision is not at issue here.

cumstances, to appear at such proceedings.”
§1229(a)(1) (boldface added).

The statute also enables the Government to “change or
postpon[e] . . . the time and place of [the removal] proceed-
ings.” §1229(a)(2)(A). To do so, the Government must give
the noncitizen “a written notice . . . specifying . . . the new
time or place of the proceedings” and “the consequences
. . . of failing, except under exceptional circumstances, to
attend such proceedings.” *Ibid.* The Government is not
required to provide written notice of the change in time or
place of the proceedings if the noncitizen is “not in deten-
tion” and “has failed to provide [his] address” to the Gov-
ernment. §1229(a)(2)(B).

The consequences of a noncitizen’s failure to appear at a
removal proceeding can be quite severe. If a noncitizen
who has been properly served with the “written notice
required under paragraph (1) or (2) of section 1229(a)”
fails to appear at a removal proceeding, he “shall be or-
dered removed in absentia” if the Government “establishes
by clear, unequivocal, and convincing evidence that the
written notice was so provided and that the alien is re-
movable.” §1229a(b)(5)(A). Absent “exceptional circum-
stances,” a noncitizen subject to an in absentia removal
order is ineligible for some forms of discretionary relief for
10 years if, “at the time of the notice described in para-
graph (1) or (2) of section 1229(a),” he “was provided oral
notice . . . of the time and place of the proceedings and of
the consequences” of failing to appear. §1229a(b)(7). In
certain limited circumstances, however, a removal order
entered in absentia may be rescinded—*e.g.,* when the
noncitizen “demonstrates that [he] did not receive notice
in accordance with paragraph (1) or (2) of section 1229(a).”
§1229a(b)(5)(C)(ii).

### B

In 1997, shortly after Congress passed IIRIRA, the

Attorney General promulgated a regulation stating that a "notice to appear" served on a noncitizen need only provide "the time, place and date of the initial removal hearing, where practicable." 62 Fed. Reg. 10332 (1997). Per that regulation, the Department of Homeland Security (DHS), at least in recent years, almost always serves noncitizens with notices that fail to specify the time, place, or date of initial removal hearings whenever the agency deems it impracticable to include such information. See Brief for Petitioner 14; Brief for Respondent 48–49; Tr. of Oral Arg. 52–53 (Government's admission that "almost 100 percent" of "notices to appear omit the time and date of the proceeding over the last three years"). Instead, these notices state that the times, places, or dates of the initial hearings are "to be determined." Brief for Petitioner 14.

In *Matter of Camarillo*, 25 I. & N. Dec. 644 (2011), the Board of Immigration Appeals (BIA) addressed whether such notices trigger the stop-time rule even if they do not specify the time and date of the removal proceedings. The BIA concluded that they do. *Id.,* at 651. It reasoned that the statutory phrase "notice to appear 'under section [1229](a)'" in the stop-time rule "merely specifies the document the DHS must serve on the alien to trigger the 'stop-time' rule," but otherwise imposes no "substantive requirements" as to what information that document must include to trigger the stop-time rule. *Id.,* at 647.

C

Petitioner Wescley Fonseca Pereira is a native and citizen of Brazil. In 2000, at age 19, he was admitted to the United States as a temporary "non-immigrant visitor." App. to Pet. for Cert. 3a. After his visa expired, he remained in the United States. Pereira is married and has two young daughters, both of whom are United States citizens. He works as a handyman and, according to submissions before the Immigration Court, is a well-

respected member of his community.

In 2006, Pereira was arrested in Massachusetts for operating a vehicle while under the influence of alcohol. On May 31, 2006, while Pereira was detained, DHS served him (in person) with a document labeled "Notice to Appear." App. 7–13. That putative notice charged Pereira as removable for overstaying his visa, informed him that "removal proceedings" were being initiated against him, and provided him with information about the "[c]onduct of the hearing" and the consequences for failing to appear. *Id.*, at 7, 10–12. Critical here, the notice did not specify the date and time of Pereira's removal hearing. Instead, it ordered him to appear before an Immigration Judge in Boston "on a date to be set at a time to be set." *Id.*, at 9 (underlining in original).

More than a year later, on August 9, 2007, DHS filed the 2006 notice with the Boston Immigration Court. The Immigration Court thereafter attempted to mail Pereira a more specific notice setting the date and time for his initial removal hearing for October 31, 2007, at 9:30 a.m. But that second notice was sent to Pereira's street address rather than his post office box (which he had provided to DHS), so it was returned as undeliverable. Because Pereira never received notice of the time and date of his removal hearing, he failed to appear, and the Immigration Court ordered him removed in absentia. Unaware of that removal order, Pereira remained in the United States.

In 2013, after Pereira had been in the country for more than 10 years, he was arrested for a minor motor vehicle violation (driving without his headlights on) and was subsequently detained by DHS. The Immigration Court reopened the removal proceedings after Pereira demonstrated that he never received the Immigration Court's 2007 notice setting out the specific date and time of his hearing. Pereira then applied for cancellation of removal, arguing that the stop-time rule was not triggered by DHS'

initial 2006 notice because the document lacked information about the time and date of his removal hearing.

The Immigration Court disagreed, finding the law "quite settled that DHS need not put a date certain on the Notice to Appear in order to make that document effective." App. to Pet. for Cert. 23a. The Immigration Court therefore concluded that Pereira could not meet the 10-year physical-presence requirement under §1229b(b), thereby rendering him statutorily ineligible for cancellation of removal, and ordered Pereira removed from the country. The BIA dismissed Pereira's appeal. Adhering to its precedent in *Camarillo*, the BIA agreed with the Immigration Court that the 2006 notice triggered the stop-time rule and that Pereira thus failed to satisfy the 10-year physical-presence requirement and was ineligible for cancellation of removal.

The Court of Appeals for the First Circuit denied Pereira's petition for review of the BIA's order. 866 F. 3d 1 (2017). Applying the framework set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), the Court of Appeals first found that the stop-time rule in §1229b(d)(1) is ambiguous because it "does not explicitly state that the date and time of the hearing must be included in a notice to appear in order to cut off an alien's period of continuous physical presence." 866 F. 3d, at 5. Then, after reviewing the statutory text and structure, the administrative context, and pertinent legislative history, the Court of Appeals held that the BIA's interpretation of the stop-time rule was a permissible reading of the statute. *Id.,* at 6–8.

## II

### A

The Court granted certiorari in this case, 583 U. S. \_\_\_ (2018), to resolve division among the Courts of Appeals on a simple, but important, question of statutory interpretation: Does service of a document styled as a "notice to

appear" that fails to specify "the items listed" in
§1229(a)(1) trigger the stop-time rule?[4]  Pet. for Cert. i.

As a threshold matter, the Court notes that the question
presented by Pereira, which focuses on all "items listed" in
§1229(a)(1), sweeps more broadly than necessary to re-
solve the particular case before us.  Although the time-
and-place information in a notice to appear will vary from
case to case, the Government acknowledges that "[m]uch
of the information Section 1229(a)(1) calls for does not"
change and is therefore "included in standardized lan-
guage on the I–862 notice-to-appear form."  Brief for Re-
spondent 36 (referencing 8 U. S. C. §§1229(a)(1)(A)–(B),
(E)–(F), and (G)(ii)).  In fact, the Government's 2006 notice
to Pereira included all of the information required by
§1229(a)(1), except it failed to specify the date and time of
Pereira's removal proceedings.  See App. 10–12.  Accord-
ingly, the dispositive question in this case is much nar-
rower, but no less vital: Does a "notice to appear" that does
not specify the "time and place at which the proceedings
will be held," as required by §1229(a)(1)(G)(i), trigger the
stop-time rule?[5]

––––––––––

[4] Compare *Orozco-Velasquez* v. *Attorney General United States*, 817
F. 3d 78, 83–84 (CA3 2016) (holding that the stop-time rule unambigu-
ously requires service of a "notice to appear" that meets §1229(a)(1)'s
requirements), with *Moscoso-Castellanos* v. *Lynch*, 803 F. 3d 1079, 1083
(CA9 2015) (finding the statute ambiguous and deferring to the BIA's
interpretation); *O'Garro* v. *United States Atty. Gen.*, 605 Fed. Appx.
951, 953 (CA11 2015) (*per curiam*) (same); *Guaman-Yuqui* v. *Lynch*,
786 F. 3d 235, 239–240 (CA2 2015) (*per curiam*) (same); *Gonzalez-
Garcia* v. *Holder*, 770 F. 3d 431, 434–435 (CA6 2014) (same); *Yi Di
Wang* v. *Holder*, 759 F. 3d 670, 674–675 (CA7 2014) (same); *Urbina* v.
*Holder*, 745 F. 3d 736, 740 (CA4 2014) (same).

[5] The Court leaves for another day whether a putative notice to ap-
pear that omits any of the other categories of information enumerated
in §1229(a)(1) triggers the stop-time rule.  Contrary to the dissent's
assertion, this exercise of judicial restraint is by no means "tantamount
to admitting" that the Government's (and dissent's) atextual interpre-

In addressing that narrower question, the Court need not resort to *Chevron* deference, as some lower courts have done, for Congress has supplied a clear and unambiguous answer to the interpretive question at hand. See 467 U. S., at 842–843 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). A putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a "notice to appear under section 1229(a)," and so does not trigger the stop-time rule.

B

The statutory text alone is enough to resolve this case. Under the stop-time rule, "any period of . . . continuous physical presence" is "deemed to end . . . when the alien is served a notice to appear under section 1229(a)." 8 U. S. C. §1229b(d)(1). By expressly referencing §1229(a), the statute specifies where to look to find out what "notice to appear" means. Section 1229(a), in turn, clarifies that the type of notice "referred to as a 'notice to appear'" throughout the statutory section is a "written notice . . . specifying," as relevant here, "[t]he time and place at which the [removal] proceedings will be held." §1229(a)(1)(G)(i). Thus, based on the plain text of the statute, it is clear that to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, "specif[ies]" the "time and place" of the removal proceedings.

It is true, as the Government and dissent point out, that the stop-time rule makes broad reference to a notice to

_____

tation is a permissible construction of the statute. *Post,* at 10 (opinion of ALITO, J.).

appear under "section 1229(a)," which includes paragraph (1), as well as paragraphs (2) and (3). See Brief for Respondent 27–28; *post,* at 5–6 (opinion of ALITO, J.). But the broad reference to §1229(a) is of no consequence, because, as even the Government concedes, only paragraph (1) bears on the meaning of a "notice to appear." Brief for Respondent 27. By contrast, paragraph (2) governs the "[n]otice of change in time or place of proceedings," and paragraph (3) provides for a system to record noncitizens' addresses and phone numbers. Nowhere else within §1229(a) does the statute purport to delineate the requirements of a "notice to appear." In fact, the term "notice to appear" appears only in paragraph (1) of §1229(a).

If anything, paragraph (2) of §1229(a) actually bolsters the Court's interpretation of the statute. Paragraph (2) provides that, "in the case of any change or postponement in the time and place of [removal] proceedings," the Government shall give the noncitizen "written notice . . . specifying . . . the new time or place of the proceedings." §1229(a)(2)(A)(i). By allowing for a "change or postponement" of the proceedings to a "new time or place," paragraph (2) presumes that the Government has already served a "notice to appear under section 1229(a)" that specified a time and place as required by §1229(a)(1)(G)(i). Otherwise, there would be no time or place to "change or postpon[e]." §1229(a)(2). Notably, the dissent concedes that paragraph (2) confirms that a notice to appear must "state the 'time and place' of the removal proceeding as required by §1229(a)(1).'" *Post,* at 13. The dissent nevertheless retorts that this point is "entirely irrelevant." *Ibid.* Not so. Paragraph (2) clearly reinforces the conclusion that "a notice to appear under section 1229(a)," §1229b(d)(1), must include at least the time and place of the removal proceedings to trigger the stop-time rule.

Another neighboring statutory provision lends further contextual support for the view that a "notice to appear"

must include the time and place of the removal proceed-
ings to trigger the stop-time rule. Section 1229(b)(1) gives
a noncitizen "the opportunity to secure counsel before the
first [removal] hearing date" by mandating that such
"hearing date shall not be scheduled earlier than 10 days
after the service of the notice to appear." For §1229(b)(1)
to have any meaning, the "notice to appear" must specify
the time and place that the noncitizen, and his counsel,
must appear at the removal hearing. Otherwise, the
Government could serve a document labeled "notice to
appear" without listing the time and location of the hear-
ing and then, years down the line, provide that infor-
mation a day before the removal hearing when it becomes
available. Under that view of the statute, a noncitizen
theoretically would have had the "opportunity to secure
counsel," but that opportunity will not be meaningful if,
given the absence of a specified time and place, the noncit-
izen has minimal time and incentive to plan accordingly,
and his counsel, in turn, receives limited notice and time
to prepare adequately. It therefore follows that, if a "no-
tice to appear" for purposes of §1229(b)(1) must include
the time-and-place information, a "notice to appear" for
purposes of the stop-time rule under §1229b(d)(1) must as
well. After all, "it is a normal rule of statutory construc-
tion that identical words used in different parts of the
same act are intended to have the same meaning."
*Taniguchi* v. *Kan Pacific Saipan, Ltd.*, 566 U. S. 560, 571
(2012) (internal quotation marks omitted).[6]

---

[6] The dissent argues that, if a notice to appear must furnish time-and-
place information, the Government "may be forced by the Court's
interpretation to guess that the hearing will take place far in the
future, only to learn shortly afterwards that the hearing is in fact
imminent." *Post,* at 14. In such a scenario, the dissent hypothesizes, a
noncitizen would be "lulled into a false sense of security" and thus
would have little meaningful opportunity to secure counsel and prepare

Finally, common sense compels the conclusion that a notice that does not specify when and where to appear for a removal proceeding is not a "notice to appear" that triggers the stop-time rule. If the three words "notice to appear" mean anything in this context, they must mean that, at a minimum, the Government has to provide noncitizens "notice" of the information, *i.e.,* the "time" and "place," that would enable them "to appear" at the removal hearing in the first place. Conveying such time-and-place information to a noncitizen is an essential function of a notice to appear, for without it, the Government cannot reasonably expect the noncitizen to appear for his removal proceedings. To hold otherwise would empower the Government to trigger the stop-time rule merely by sending noncitizens a barebones document labeled "Notice to Appear," with no mention of the time and place of the removal proceedings, even though such documents would do little if anything to facilitate appearance at those proceedings.[7] "'We are not willing to impute to Congress . . .

——————

adequately. *Ibid.* But nothing in our interpretation of the statute "force[s]" the Government to guess when and where a hearing will take place, *ibid.*, nor does our interpretation prevent DHS and the Immigration Courts from working together to streamline the scheduling of removal proceedings, see *infra,* at 18–19. Far from "lull[ing]" noncitizens into a false sense of security, *post,* at 14, our reading (unlike the Government's and the dissent's) still gives meaning to a noncitizen's "opportunity to secure counsel before the first [removal] hearing date," §1229(b)(1), by informing the noncitizen that the Government is committed to moving forward with removal proceedings at a specific time and place. Equipped with that knowledge, a noncitizen has an incentive to obtain counsel and prepare for his hearing.

[7]At oral argument, the Government conceded that a blank piece of paper would not suffice to trigger the stop-time rule because (in its view) such a hypothetical notice would fail to specify the charges against the noncitizen. Tr. of Oral Arg. 39–40 (arguing that notice to appear must "tell the alien what proceedings he must appear for and why he must appear for them"). The dissent also endorses the view

such [a] contradictory and absurd purpose,'" *United States*
v. *Bryan*, 339 U. S. 323, 342 (1950), particularly where
doing so has no basis in the statutory text.

## III

Straining to inject ambiguity into the statute, the Gov-
ernment and the dissent advance several overlapping
arguments. None is persuasive.

## A

First, the Government posits that §1229(a) "is not worded
in the form of a definition" and thus cannot circum-
scribe what type of notice counts as a "notice to appear" for
purposes of the stop-time rule. Brief for Respondent 32.
Section 1229(a), however, does speak in definitional terms,
at least with respect to the "time and place at which the
proceedings will be held": It specifically provides that the
notice described under paragraph (1) is "referred to as a
'notice to appear,'" which in context is quintessential
definitional language.[8] It then defines that term as a

––––––––

that a notice to appear "can also be understood to serve primarily as a
charging document." *Post,* at 14–15. But neither the Government nor
the dissent offers any convincing basis, much less one rooted in the
statutory text, for treating time-and-place information as any less
crucial than charging information for purposes of triggering the stop-
time rule. Furthermore, there is no reason why a notice to appear
should have only one essential function. Even if a notice to appear
functions as a "charging document," that is not mutually exclusive with
the conclusion that a notice to appear serves another equally integral
function: telling a noncitizen when and where to appear. At bottom,
the Government's self-serving position that a notice to appear must
specify charging information, but not the time-and-place information,
reveals the arbitrariness inherent in its atextual approach to the stop-
time rule.

[8] Congress has employed similar definitional language in other statu-
tory schemes. See, *e.g.,* 21 U. S. C. §356(b)(1) (creating new class of
"fast track product[s]" by setting out drug requirements and providing:
"In this section, such a drug is referred to as a 'fast track product'");

"written notice" that, as relevant here, "specif[ies] . . . [t]he time and place at which the [removal] proceedings will be held." §1229(a)(1)(G)(i). Thus, when the term "notice to appear" is used elsewhere in the statutory section, including as the trigger for the stop-time rule, it carries with it the substantive time-and-place criteria required by §1229(a).

Resisting this straightforward understanding of the text, the dissent posits that "§1229(a)(1)'s language can be understood to define what makes a notice to appear *complete*." *Post*, at 10 (emphasis in original). In the dissent's view, a defective notice to appear is still a "notice to appear" even if it is incomplete—much like a three-wheeled Chevy is still a car. *Post,* at 10–11. The statutory text proves otherwise. Section 1229(a)(1) does not say a "notice to appear" is "complete" when it specifies the time and place of the removal proceedings. Rather, it defines a "notice to appear" as a "written notice" that "specif[ies]," at a minimum, the time and place of the removal proceedings. §1229(a)(1)(G)(i). Moreover, the omission of time-and-place information is not, as the dissent asserts, some trivial, ministerial defect, akin to an unsigned notice of appeal. Cf. *Becker* v. *Montgomery*, 532 U. S. 757, 763, 768 (2001). Failing to specify integral information like the time and place of removal proceedings unquestionably would "deprive [the notice to appear] of its essential character." *Post,* at 12, n. 5; see *supra,* at 12–13, n. 7.[9]

———————

§356(a)(1) ("In this section, such a drug is referred to as a 'breakthrough therapy'"); 38 U. S. C. §7451(a)(2) ("hereinafter in this section referred to as 'covered positions'"); 42 U. S. C. §285g–4(b) ("hereafter in this section referred to as 'medical rehabilitation'").

[9] The dissent maintains that Congress' decision to make the stop-time rule retroactive to certain pre-IIRIRA "orders to show cause" "sheds considerable light on the question presented" because orders to show cause did not necessarily include time-and-place information. *Post,* at

## B

The Government and the dissent next contend that Congress' use of the word "under" in the stop-time rule renders the statute ambiguous. Brief for Respondent 22–23; *post,* at 4–5. Recall that the stop-time rule provides that "any period of . . . continuous physical presence" is "deemed to end . . . when the alien is served a notice to appear under section 1229(a)." §1229b(d)(1)(A). According to the Government, the word "under" in that provision means "subject to," "governed by," or "issued under the authority of." Brief for Respondent 24. The dissent offers yet another alternative, insisting that "under" can also mean "authorized by." *Post,* at 4. Those definitions, the Government and dissent maintain, support the BIA's view that the stop-time rule applies so long as DHS serves a notice that is "authorized by," or "subject to or governed by, or issued under the authority of" §1229(a), even if the notice bears none of the time-and-place information required by that provision. See Brief for Respondent 24; *post,* at 4–5.

We disagree. It is, of course, true that "[t]he word 'under' is [a] chameleon" that "'must draw its meaning from its context.'" *Kucana* v. *Holder*, 558 U. S. 233, 245 (2010) (quoting *Ardestani* v. *INS*, 502 U. S. 129, 135 (1991)). But nothing in the text or context here supports either the Government's or the dissent's preferred definition of "under." Based on the plain language and statutory context discussed above, we think it obvious that the word "un-

—————

6–7. That argument compares apples to oranges. Even if the stop-time rule sometimes applies retroactively to an order to show cause, that provides scant support for the dissent's view that, under the new post-IIRIRA statutory regime, an entirely different document called a "notice to appear," which, by statute, must specify the time and place of removal proceedings, see §1229(a)(1)(G)(i), need not include such information to trigger the stop-time rule.

der," as used in the stop-time rule, can only mean "in accordance with" or "according to," for it connects the stop-time trigger in §1229b(d)(1) to a "notice to appear" that contains the enumerated time-and-place information described in §1229(a)(1)(G)(i). See 18 Oxford English Dictionary 950 (2d ed. 1989) (defining "under" as "[i]n accordance with"); Black's Law Dictionary 1525 (6th ed. 1990) (defining "under" as "according to"). So construed, the stop-time rule applies only if the Government serves a "notice to appear" "[i]n accordance with" or "according to" the substantive time-and-place requirements set forth in §1229(a). See *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U. S. 519, 530 (2013) (internal quotation marks omitted). Far from generating any "degree of ambiguity," *post,* at 4, the word "under" provides the glue that bonds the stop-time rule to the substantive time-and-place requirements mandated by §1229(a).

C

The Government argues that surrounding statutory provisions reinforce its preferred reading. See Brief for Respondent 25–27. It points, for instance, to two separate provisions relating to in absentia removal orders: §1229a(b)(5)(A), which provides that a noncitizen may be removed in absentia if the Government has provided "written notice required under paragraph (1) or (2) of section 1229(a)"; and §1229a(b)(5)(C)(ii), which provides that, once an in absentia removal order has been entered, the noncitizen may seek to reopen the proceeding if, *inter alia*, he "demonstrates that [he] did not receive notice in accordance with paragraph (1) or (2) of section 1229(a)." According to the Government, those two provisions use the distinct phrases "required under" and "in accordance with" as shorthand for a notice that satisfies §1229(a)(1)'s requirements, whereas the stop-time rule uses the phrase "under section 1229(a)" to encompass a different type of

notice that does not necessarily include the information outlined in §1229(a)(1). See Brief for Respondent 25–26. That logic is unsound. The Government essentially argues that phrase 1 ("written notice required under paragraph (1) . . . of section 1229(a)") and phrase 2 ("notice in accordance with paragraph (1) . . . of section 1229(a)") can refer to the same type of notice even though they use entirely different words, but that phrase 3 ("notice to appear under section 1229(a)") cannot refer to that same type of notice because it uses words different from phrases 1 and 2. But the Government offers no convincing reason why that is so. The far simpler explanation, and the one that comports with the actual statutory language and context, is that each of these three phrases refers to notice satisfying, at a minimum, the time-and-place criteria defined in §1229(a)(1).

Equally unavailing is the Government's invocation of §1229a(b)(7). Brief for Respondent 26–27. Under that provision, a noncitizen who is ordered removed in absentia is ineligible for various forms of discretionary relief for a 10-year period if the noncitizen, "at the time of the notice described in paragraph (1) or (2) of section 1229(a) of [Title 8], was provided oral notice . . . of the time and place of the proceedings" and "of the consequences . . . of failing, other than because of exceptional circumstances," to appear. §1229a(b)(7). The Government argues that the express reference to "the time and place of the proceedings" in §1229a(b)(7) shows that, when Congress wants to attach substantive significance to whether a noncitizen is given information about the specific "time and place" of a removal proceeding, it knows exactly how to do so. Brief for Respondent 26–27. But even if §1229a(b)(7) may impose harsher consequences on noncitizens who fail to appear at removal proceedings after having specifically received oral notice of the time and place of such proceedings, that reveals nothing about the distinct question here—*i.e.,*

whether Congress intended the stop-time rule to apply when the Government fails to provide written notice of the time and place of removal proceedings. As to that question, the statute makes clear that Congress fully intended to attach substantive significance to the requirement that noncitizens be given notice of at least the time and place of their removal proceedings. A document that fails to include such information is not a "notice to appear under section 1229(a)" and thus does not trigger the stop-time rule.

D

Unable to find sure footing in the statutory text, the Government and the dissent pivot away from the plain language and raise a number of practical concerns. These practical considerations are meritless and do not justify departing from the statute's clear text. See *Burrage* v. *United States*, 571 U. S. 204, 218 (2014).

The Government, for its part, argues that the "administrative realities of removal proceedings" render it difficult to guarantee each noncitizen a specific time, date, and place for his removal proceedings. See Brief for Respondent 48. That contention rests on the misguided premise that the time-and-place information specified in the notice to appear must be etched in stone. That is incorrect. As noted above, §1229(a)(2) expressly vests the Government with power to change the time or place of a noncitizen's removal proceedings so long as it provides "written notice . . . specifying . . . the new time or place of the proceedings" and the consequences of failing to appear. See §1229(a)(2); Tr. of Oral Arg. 16–19. Nothing in our decision today inhibits the Government's ability to exercise that statutory authority after it has served a notice to appear specifying the time and place of the removal proceedings.

The dissent raises a similar practical concern, which is similarly misplaced. The dissent worries that requiring

the Government to specify the time and place of removal proceedings, while allowing the Government to change that information, might encourage DHS to provide "arbitrary dates and times that are likely to confuse and confound all who receive them." *Post,* at 8. The dissent's argument wrongly assumes that the Government is utterly incapable of specifying an accurate date and time on a notice to appear and will instead engage in "arbitrary" behavior. See *ibid.* The Court does not embrace those unsupported assumptions. As the Government concedes, "a scheduling system previously enabled DHS and the immigration court to coordinate in setting hearing dates in some cases." Brief for Respondent 50, n. 15; Brief for National Immigrant Justice Center as *Amicus Curiae* 30–31. Given today's advanced software capabilities, it is hard to imagine why DHS and immigration courts could not again work together to schedule hearings before sending notices to appear.

Finally, the dissent's related contention that including a changeable date would "mislead" and "prejudice" noncitizens is unfounded. *Post,* at 8. As already explained, if the Government changes the date of the removal proceedings, it must provide written notice to the noncitizen, §1229(a)(2). This notice requirement mitigates any potential confusion that may arise from altering the hearing date. In reality, it is the dissent's interpretation of the statute that would "confuse and confound" noncitizens, *post,* at 8, by authorizing the Government to serve notices that lack any information about the time and place of the removal proceedings.

E

In a last ditch effort to salvage its atextual interpretation, the Government invokes the alleged purpose and legislative history of the stop-time rule. Brief for Respondent 37–40. Even for those who consider statutory

purpose and legislative history, however, neither supports the Government's atextual position that Congress intended the stop-time rule to apply when a noncitizen has been deprived notice of the time and place of his removal proceedings. By the Government's own account, Congress enacted the stop-time rule to prevent noncitizens from exploiting administrative delays to "buy time" during which they accumulate periods of continuous presence. *Id.,* at 37–38 (citing H. R. Rep. No. 104–469, pt. 1, p. 122 (1996)). Requiring the Government to furnish time-and-place information in a notice to appear, however, is entirely consistent with that objective because, once a proper notice to appear is served, the stop-time rule is triggered, and a noncitizen would be unable to manipulate or delay removal proceedings to "buy time." At the end of the day, given the clarity of the plain language, we "apply the statute as it is written." *Burrage*, 571 U. S., at 218.

## IV

For the foregoing reasons, the judgment of the Court of Appeals for the First Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–459

_____

## WESCLEY FONSECA PEREIRA, PETITIONER *v.* JEFFERSON B. SESSIONS, III, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 21, 2018]

JUSTICE KENNEDY, concurring.

I agree with the Court's opinion and join it in full.

This separate writing is to note my concern with the way in which the Court's opinion in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), has come to be understood and applied. The application of that precedent to the question presented here by various Courts of Appeals illustrates one aspect of the problem.

The first Courts of Appeals to encounter the question concluded or assumed that the notice necessary to trigger the stop-time rule found in 8 U. S. C. §1229b(d)(1) was not "perfected" until the immigrant received all the information listed in §1229(a)(1). *Guamanrrigra* v. *Holder*, 670 F. 3d 404, 410 (CA2 2012) (*per curiam*); see also *Dababneh* v. *Gonzales*, 471 F. 3d 806, 809 (CA7 2006); *Garcia-Ramirez* v. *Gonzales*, 423 F. 3d 935, 937, n. 3 (CA9 2005) (*per curiam*).

That emerging consensus abruptly dissolved not long after the Board of Immigration Appeals (BIA) reached a contrary interpretation of §1229b(d)(1) in *Matter of Camarillo*, 25 I. & N. Dec. 644 (2011). After that administrative ruling, in addition to the decision under review here, at least six Courts of Appeals, citing *Chevron*, concluded that §1229b(d)(1) was ambiguous and then held that the BIA's

interpretation was reasonable. See *Moscoso-Castellanos* v. *Lynch*, 803 F. 3d 1079, 1083 (CA9 2015); *O'Garro* v. *United States Atty. Gen.*, 605 Fed. Appx. 951, 953 (CA11 2015) (*per curiam*); *Guaman-Yuqui* v. *Lynch*, 786 F. 3d 235, 239–240 (CA2 2015) (*per curiam*); *Gonzalez-Garcia* v. *Holder*, 770 F. 3d 431, 434–435 (CA6 2014); *Yi Di Wang* v. *Holder*, 759 F. 3d 670, 674–675 (CA7 2014); *Urbina* v. *Holder*, 745 F. 3d 736, 740 (CA4 2014). But see *Orozco-Velasquez* v. *Attorney General United States*, 817 F. 3d 78, 81–82 (CA3 2016). The Court correctly concludes today that those holdings were wrong because the BIA's interpretation finds little support in the statute's text.

In according *Chevron* deference to the BIA's interpretation, some Courts of Appeals engaged in cursory analysis of the questions whether, applying the ordinary tools of statutory construction, Congress' intent could be discerned, 467 U. S., at 843, n. 9, and whether the BIA's interpretation was reasonable, *id.,* at 845. In *Urbina* v. *Holder*, for example, the court stated, without any further elaboration, that "we agree with the BIA that the relevant statutory provision is ambiguous." 745 F. 3d, at 740. It then deemed reasonable the BIA's interpretation of the statute, "for the reasons the BIA gave in that case." *Ibid.* This analysis suggests an abdication of the Judiciary's proper role in interpreting federal statutes.

The type of reflexive deference exhibited in some of these cases is troubling. And when deference is applied to other questions of statutory interpretation, such as an agency's interpretation of the statutory provisions that concern the scope of its own authority, it is more troubling still. See *Arlington* v. *FCC*, 569 U. S. 290, 327 (2013) (ROBERTS, C. J., dissenting) ("We do not leave it to the agency to decide when it is in charge"). Given the concerns raised by some Members of this Court, see, *e.g., id.,* at 312–328; *Michigan* v. *EPA*, 576 U. S. ___, ___ (2015) (THOMAS, J., concurring); *Gutierrez-Brizuela* v. *Lynch*, 834

F. 3d 1142, 1149–1158 (CA10 2016) (Gorsuch, J., concur-
ring), it seems necessary and appropriate to reconsider, in
an appropriate case, the premises that underlie *Chevron*
and how courts have implemented that decision.   The
proper rules for interpreting statutes and determining
agency jurisdiction and substantive agency powers should
accord with constitutional separation-of-powers principles
and the function and province of the Judiciary.  See, *e.g.*,
*Arlington*, *supra*, at 312–316 (ROBERTS, C. J., dissenting).

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–459

_____

## WESCLEY FONSECA PEREIRA, PETITIONER *v.* JEFFERSON B. SESSIONS, III, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 21, 2018]

JUSTICE ALITO, dissenting.

Although this case presents a narrow and technical issue of immigration law, the Court's decision implicates the status of an important, frequently invoked, once celebrated, and now increasingly maligned precedent, namely, *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). Under that decision, if a federal statute is ambiguous and the agency that is authorized to implement it offers a reasonable interpretation, then a court is supposed to accept that interpretation. Here, a straightforward application of *Chevron* requires us to accept the Government's construction of the provision at issue. But the Court rejects the Government's interpretation in favor of one that it regards as the best reading of the statute. I can only conclude that the Court, for whatever reason, is simply ignoring *Chevron*.

I

As amended, the Immigration and Nationality Act generally requires the Government to remove nonpermanent resident aliens who overstay the terms of their admission into this country. See 8 U. S. C. §§1227(a)(1)(B)–(C). But under certain circumstances, the Government may decide to cancel their removal instead. See §1229b. To be eligible for such relief, an alien must demonstrate

that he or she "has been physically present in the United States for a continuous period of not less than 10 years." §1229b(b)(1)(A). "For purposes of" that rule, however, "any period of . . . continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title." §1229b(d)(1). That language acts as a stop-time rule, preventing the continuous-presence clock from continuing to run once an alien is served with a notice to appear.

The question presented by this case is whether the stop-time rule is triggered by service of a notice to appear that is incomplete in some way. A provision of the amended Immigration and Nationality Act requires that the Government serve an alien who it seeks to remove with a notice to appear "specifying" a list of things, including "[t]he nature of the proceedings against the alien," "[t]he legal authority under which the proceedings are conducted," "[t]he acts or conduct alleged to be in violation of law," "[t]he charges against the alien and the statutory provisions alleged to have been violated," and (what is relevant here) "[t]he time and place at which the proceedings will be held." §§1229(a)(1)(A), (B), (C), (D), (G)(i).

Petitioner Wescley Pereira is a Brazilian citizen who entered the United States lawfully in 2000 but then illegally overstayed his nonimmigrant visa. In 2006, the Government caused him to be served in person with a document styled as a notice to appear for removal proceedings. Pereira concedes that he overstayed his visa and is thus removable, but he argues that he is nonetheless eligible for cancellation of removal because he has now been in the country continuously for more than 10 years. He contends that the notice served on him in 2006 did not qualify as a notice to appear because it lacked one piece of information that such a notice is supposed to contain, namely, the time at which his removal proceedings were to

be held. Thus, Pereira contends, that notice did not trigger the stop-time rule, and the clock continued to run.

The Board of Immigration Appeals (BIA) has rejected this interpretation of the stop-time rule in the past. It has held that "[a]n equally plausible reading" is that the stop-time rule "merely specifies the document the [Government] must serve on the alien to trigger the 'stop-time' rule and does not impose substantive requirements for a notice to appear to be effective in order for that trigger to occur." *In re Camarillo*, 25 I. & N. Dec. 644, 647 (2011). It therefore held in this case that Pereira is ineligible for cancellation of removal.

## II

### A

Pereira, on one side, and the Government and the BIA, on the other, have a quasi-metaphysical disagreement about the meaning of the concept of a notice to appear. Is a notice to appear a document that contains certain essential characteristics, namely, all the information required by §1229(a)(1), so that any notice that omits any of that information is not a "notice to appear" at all? Or is a notice to appear a document that is conventionally called by that name, so that a notice that omits some of the information required by §1229(a)(1) may still be regarded as a "notice to appear"?

Picking the better of these two interpretations might have been a challenge in the first instance. But the Court did not need to decide that question, for under *Chevron* we are obligated to defer to a Government agency's interpretation of the statute that it administers so long as that interpretation is a "'permissible'" one. *INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 424 (1999). All that is required is that the Government's view be "reasonable"; it need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy*

*Corp.* v. *Riverkeeper, Inc.*, 556 U. S. 208, 218 (2009). Moreover, deference to the Government's interpretation "is especially appropriate in the immigration context" because of the potential foreign-policy implications. *Aguirre-Aguirre*, *supra*, at 425. In light of the relevant text, context, statutory history, and statutory purpose, there is no doubt that the Government's interpretation of the stop-time rule is indeed permissible under *Chevron*.

B

By its terms, the stop-time rule is consistent with the Government's interpretation. As noted, the stop-time rule provides that "any period of . . . continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title." §1229b(d)(1). A degree of ambiguity arises from Congress's use of the word "under," for as the Court recognizes, "'[t]he word "under" is [a] chameleon,'" *ante*, at 15, having "'many dictionary definitions'" and no "uniform, consistent meaning," *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U. S. 519, 531 (2013). Everyone agrees, however, that "under" is often used to mean "authorized by." See, *e.g.*, Webster's New World College Dictionary 1453 (3d ed. 1997) ("authorized . . . by"); American Heritage Dictionary 1945 (3d ed. 1992) ("With the authorization of"); see also Brief for Respondent 24 (agreeing that "under" can mean "subject to," "governed by," or "issued under the authority of"); Brief for Petitioner 28. And when the term is used in this way, it does not necessarily mean that the act done pursuant to that authorization was done in strict compliance with the terms of the authorization. For example, one might refer to a litigant's disclosure "under" Rule 26(a) of the Federal Rules of Civil Procedure even if that disclosure did not comply with Rule 26(a) in every respect. Or one might refer to regulations promulgated "under" a statute even if a court later found those regula-

tions inconsistent with the statute's text.

That use of the word "under" perfectly fits the Government's interpretation of the stop-time rule. The Government served Pereira with a notice to appear "under" §1229(a) in the sense that the notice was "authorized by" that provision, which states that a notice to appear "shall be given" to an alien in a removal proceeding and outlines several rules governing such notices. On that reasonable reading, the phrase "under section 1229(a)" acts as shorthand for the type of document governed by §1229(a).

C

That interpretation is bolstered by the stop-time rule's cross-reference to "section 1229(a)." §1229b(d)(1). Pereira interprets that cross-reference as picking up every substantive requirement that applies to notices to appear. But those substantive requirements are found only in §1229(a)*(1)*. Thus, the cross-reference to "section 1229(a)," as opposed to "section 1229(a)(1)," tends to undermine Pereira's interpretation, because if Congress had meant for the stop-time rule to incorporate the substantive requirements located in §1229(a)(1), it presumably would have referred specifically to that provision and not more generally to "section 1229(a)." We normally presume that "[w]hen Congress want[s] to refer only to a particular subsection or paragraph, it [says] so," *NLRB* v. *SW General, Inc.*, 580 U. S. ___, ___ (2017) (slip op., at 9), and it is instructive that neighboring statutory provisions in this case are absolutely riddled with such specific cross-references.[1] In the stop-time rule, however, Congress chose to insert a broader cross-reference, one that refers to the general process of serving notices to appear as a

———————

[1] See, *e.g.*, §1229a(b)(5)(A) ("paragraph (1) . . . of section 1229(a)"); §1229a(b)(5)(C)(ii) (same); §1229a(b)(7) (same); §1229a(b)(5)(B) ("address required under section 1229(a)(1)(F)"); see also §1229a(b)(7) (referring to §1229(a)(1)(G)(i)'s "time and place" requirement).

whole.  See §1229(a).  Thus, Pereira essentially "wants to cherry pick from the material covered by the statutory cross-reference.  But if Congress had intended to refer to the definition in [§1229(a)(1)] alone, it presumably would have done so."  *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. ___, ___ (2018) (slip op., at 9).[2]

D

Statutory history also strongly supports the Government's argument that a notice to appear should trigger the stop-time rule even if it fails to include the date and time of the alien's removal proceeding.  When Congress enacted the stop-time rule, it decreed that the rule should "apply to notices to appear issued before, on, or after the date of the enactment of this Act."  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, §309(c)(5), 110 Stat. 3009–627.  This created a problem: Up until that point, there was no such thing as a "notice to appear," so the reference to "notices to appear issued before . . . this Act" made little sense.  When Congress became aware of the problem, it responded by clarifying that the stop-time rule should apply not only to notices to appear, but also "to orders to show cause . . . issued before, on, or after the date" of the clarifying amendment's enactment.  Nicaraguan Adjustment and Central American Relief Act, §203(1), 111 Stat. 2196, as amended 8 U. S. C. §1101 note.  That clarification sheds considerable light on the question presented here because orders to show cause did not necessarily include the date or location of proceedings (even if

———————

[2] According to the Court, "the broad reference to §1229(a) is of no consequence, because, as even the Government concedes, only paragraph (1) bears on the meaning of a 'notice to appear.'"  *Ante*, at 10.  But that is precisely the point: If "only paragraph (1) bears on the meaning of a 'notice to appear,'" then Congress's decision to refer to §1229(a) more broadly indicates that it meant to do something *other* than to pick up the substantive requirements of §1229(a)(1).

they otherwise served a function similar to that now served by notices to appear). See 8 U. S. C. §1252b(a)(2)(A) (1994 ed.).

That statutory history supports the Government's interpretation twice over. First, it demonstrates that when it comes to triggering the stop-time rule, Congress attached no particular significance to the presence (or absence) of information about the date and time of a removal proceeding. Congress was more than happy for the stop-time rule to be activated either by notices to appear or by orders to show cause, even though the latter often lacked any information about the date and time of proceedings.

Second, and even more important, the statutory history also shows that Congress clearly thought of orders to show cause as the functional equivalent of notices to appear for purposes of the stop-time rule. After an initially confusing reference to "notices to appear" issued before the creation of the stop-time rule, Congress clarified that it had meant to refer to "orders to show cause." By equating orders to show cause with notices to appear, Congress indicated that when the stop-time rule refers to "a notice to appear," it is referring to a category of documents that do not necessarily provide the date and time of a future removal proceeding.[3]

E

Finally, Pereira's contrary interpretation leads to consequences that clash with any conceivable statutory purpose. Pereira's interpretation would require the Government to include a date and time on every notice to appear that it issues. But at the moment, the Government lacks the ability to do that with any degree of accuracy. The

---

[3] Although the Court charges me with "compar[ing] apples to oranges," *ante*, at 15, n. 9, Congress was the one that equated orders to show cause and notices to appear for purposes of the stop-time rule. By ignoring that decision, the Court rewrites the statute to *its* taste.

Department of Homeland Security sends out the initial notice to appear, but the removal proceedings themselves are scheduled by the Immigration Court, which is part of the Department of Justice. See 8 CFR §1003.18(a) (2018). The Department of Homeland Security cannot dictate the scheduling of a matter on the docket of the Immigration Court, and at present, the Department of Homeland Security generally cannot even access the Immigration Court's calendar. *In re Camarillo*, 25 I. & N. Dec., at 648; Tr. of Oral Arg. 52–53. The Department of Homeland Security may thus be hard pressed to include on initial notices to appear a hearing date that is anything more than a rough estimate subject to considerable change. See §1229(a)(2); see also *ante*, at 18 (disclaiming any effect on the Government's ability to change initial hearing dates).

Including an estimated and changeable date, however, may do much more harm than good. See *Gonzalez-Garcia* v. *Holder*, 770 F. 3d 431, 434–435 (CA6 2014). It is likely to mislead many recipients and to prejudice those who make preparations on the assumption that the initial date is firm. And it forces the Government to go through the pointless exercise of first including a date that it knows may very well be altered and then changing it once the real date becomes clear. Such a system serves nobody's interests.

Statutory interpretation is meant to be "a holistic endeavor," and sometimes language "that may seem ambiguous in isolation" becomes clear because "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988). The real-world effects produced by Pereira's interpretation—arbitrary dates and times that are likely to confuse and confound all who receive them—illustrate starkly the merits of the Government's alternative construction.

III

Based on the relevant text, context, statutory history, and statutory purpose, the Government makes a convincing case that the stop-time rule can be triggered even by a notice to appear that omits the date and time of a removal proceeding. But the Court holds instead that in order "to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Ante*, at 9. According to the Court, that conclusion is compelled by the statutory text, the statutory context, and "common sense." *Ante*, at 12. While the Court's interpretation may be reasonable, the Court goes much too far in saying that it is the *only* reasonable construction.

A

Start with the text. As noted, the stop-time rule provides that "any period of . . . continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a)." §1229b(d)(1). The Court does not dispute that it is entirely consistent with standard English usage to read this language as the Government and I do. See *ante*, at 15. It therefore follows that the stop-time rule itself does not foreclose the Government's interpretation.

That leaves only §1229(a)(1), which specifies the information that a notice to appear must contain. The Court's treatment of this provision contradicts itself. On the one hand, the Court insists that this provision is "definitional" and that it sets out the essential characteristics without which a notice is not a notice to appear. *Ante*, at 13. But on the other hand, the Court states that it "leaves for another day whether a putative notice to appear that omits any of the other categories of information enumerated in §1229(a)(1) triggers the stop-time rule." *Ante*, at 8, n. 5. The Court cannot have it both ways. If §1229(a)(1) is

definitional and sets out the essential characteristics of a notice to appear, then the omission of any required item of information makes a putative notice to appear a nullity. So if the Court means what it says—that its interpretation of §1229(a)(1)'s language leaves open the consequences of omitting other categories of information—that is tantamount to admitting that §1229(a)(1) itself cannot foreclose the Government's interpretation.[4]

In any event, the Government's interpretation can easily be squared with the text of §1229(a)(1). That provision states that a "written notice (*in this section referred to as a 'notice to appear'*) shall be given in person to the alien . . . specifying" 10 categories of information, including the "time and place" of the removal proceeding. §1229(a)(1) (emphasis added). According to Pereira, that language cinches the case against the Government's interpretation: By equating a "notice to appear" with a "written notice . . . [that] specif[ies]" the relevant categories of information, §1229(a)(1) establishes that a notice lacking any of those 10 pieces of information cannot qualify as a "notice to appear" and thus cannot trigger the stop-time rule. In Pereira's eyes, §1229(a)(1) defines what a notice to appear is, and most of the Court's opinion is to the same effect.

This may be a plausible interpretation of §1229(a)(1)'s language, but it is not the only one. It is at least as reasonable to read that language as simply giving a name to the new type of notice to which that provision refers. Or to put the point another way, §1229(a)(1)'s language can be understood to define what makes a notice to appear *complete*. See *In re Camarillo, supra*, at 647. Under that

—————————

[4] Nor can the Court get away with labeling its self-contradictions as "judicial restraint." *Ante*, at 8, n. 5. Either §1229(a)(1) sets out the essential characteristics of a notice to appear or it does not; the Court cannot stop at a halfway point unsupported by either text or logic while maintaining that its resting place is "clear" in light of the statutory text. *Ante*, at 9.

interpretation, a notice that omits some of the information required by §1229(a)(1) might still be a "notice to appear."

We often use language in this way. In everyday life, a person who sees an old Chevy with three wheels in a junkyard would still call it a car. Language is often used the same way in the law. Consider the example of a notice of appeal. Much like a notice to appear, a notice of appeal must meet several substantive requirements; all notices of appeal, for example, "must be signed." Fed. Rule Civ. Proc. 11(a). So what happens if a notice of appeal is incomplete in some way—say, because it is unsigned but otherwise impeccable? If a court clerk wanted to point out the lack of a signature to an attorney, the clerk is far more likely to say, "there is a problem with your notice of appeal," than to say, "there is a problem with this document you filed; it's not signed and therefore I don't know what to call it, but I can't call it a notice of appeal because it is unsigned."

Furthermore, just because a legal document is incomplete, it does not necessarily follow that it is without legal effect. Consider again the notice of appeal. As a general matter, an appeal "may be taken" in a civil case "only by filing a notice of appeal" "within 30 days after entry of the judgment or order appealed from." Fed. Rules App. Proc. 3(a), 4(a)(1)(A). While an unsigned notice of appeal does not meet the substantive requirements set out in Rule 11, in *Becker* v. *Montgomery*, 532 U. S. 757, 763, 768 (2001), this Court unanimously held that a litigant who filed a timely but unsigned notice of appeal still beat the 30-day clock for filing appeals. As we explained, "imperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court." *Id.*, at 767.

If Rule 11 of the Federal Rules of Civil Procedure can be read in this way, it is not unreasonable to do the same with §1229(a)(1). And in trying to distinguish an empty

signature line on a notice of appeal as a "trivial, ministe-
rial defect," *ante*, at 14, the Court gives the game away by
once again assuming its own conclusion. Whether the
omission of the date and time certain on a notice to appear
is essential for present purposes is the central issue in this
case, and the Court gives no textually based reason to
think that it is. The Government could reasonably con-
clude that a notice to appear that omits the date and time
of a proceeding is still a notice to appear (albeit a defective
one), much in the same way that a complaint without the
e-mail address of the signer is still a complaint (albeit a
defective one, see Rule 11(a)), or a clock missing the num-
ber "8" is still a clock (albeit a defective one).

Pereira and the Court are right that §1229(a)(1) sets out
the substantive requirements for notices to appear, but
that fact alone does not control whether an incomplete
notice to appear triggers the stop-time rule.[5]

## B

With the text of both the stop-time rule and §1229(a)(1)
irreducibly ambiguous, the Court must next look to two
neighboring provisions to support its conclusion that its
interpretation is the only reasonable one. Neither provi-
sion is sufficient.

The Court first observes that the second paragraph of
§1229(a) allows the Government to move or reschedule a
removal proceeding unilaterally and then to inform the
alien of "the new time or place of the proceedings."

---

[5] Of course, courts should still demand that the Government justify
why whatever is left off a notice to appear does not deprive it of its
essential character as a "notice to appear." As the Government rightly
concedes, for example, a blank sheet of paper would not constitute a
"notice to appear." Tr. of Oral Arg. 39; see Brief for Respondent 35–36.
But for all the reasons the Government gives, omission of the date and
time of a future removal proceeding is not, by itself, enough to turn a
notice to appear into something else.

§1229(a)(2)(A)(i). "By allowing for a 'change or postpone-ment' of the proceedings to a 'new time or place,'" the Court reasons, "paragraph (2) presumes that the Govern-ment has already served a 'notice to appear . . .' that speci-fied a time and place as required." *Ante*, at 10.

That is entirely correct—and entirely irrelevant. No one doubts that §1229(a)(1) requires that a notice to appear include the "time and place" of the removal proceeding. See §1229(a)(1)(G)(i). Indeed, that is common ground between the two parties. See Brief for Petitioner 10–11; Brief for Respondent 3. Paragraph (2) undoubtedly as-sumes that notices to appear will state the "time and place" of the removal proceeding as required by §1229(a)(1), but it has nothing to say about whether the failure to include that information affects the operation of the stop-time rule. By suggesting otherwise, the Court is merely reasoning backwards from its conclusion.

The other provision cited by the Court, §1229(b)(1), is no more helpful. As the Court explains, §1229(b)(1) generally precludes the Government from scheduling a hearing date "'earlier than 10 days after the service of the notice to appear'" in order to give the alien "'the opportunity to secure counsel.'" *Ante*, at 11. Unless a notice to appear includes the time and place of the hearing, the Court frets, "the Government could serve a document labeled 'notice to appear' without listing the time and location of the hear-ing and then, years down the line, provide that infor-mation a day before the removal hearing when it becomes available." *Ibid.* But that remote and speculative possi-bility depends entirely on the Immigration Court's allow-ing a removal proceeding to go forward only one day after an alien (and the Government) receives word of a hearing date. See 8 CFR §1003.18(a). Even assuming that such an unlikely event were to come to pass, the court's decision would surely be subject to review on appeal. See generally 8 CFR §1003.1, 8 U. S. C. §1252. Regardless, the Court's

interpretation of the stop-time rule would not prevent a
similar type of problem from arising. When the Govern-
ment sends an initial notice to appear from now on, it may
be forced by the Court's interpretation to guess that the
hearing will take place far in the future, only to learn
shortly afterwards that the hearing is in fact imminent.
An alien lulled into a false sense of security by that initial
notice to appear will have as little meaningful "'opportun-
ity to secure counsel'" and "time to prepare adequately,"
*ante*, at 11, as one who initially received a notice to appear
without any hearing date.

### C

Finally, the Court turns to "common sense" to support
its preferred reading of the text. According to the Court, it
should be "obvious" to anyone that "a notice that does not
specify when and where to appear for a removal proceed-
ing is not a 'notice to appear.'" *Ante*, at 2, 12. But what
the Court finds so obvious somehow managed to elude
every Court of Appeals to consider the question save one.
See *Moscoso-Castellanos* v. *Lynch*, 803 F. 3d 1079, 1083
(CA9 2015); *O'Garro* v. *U. S. Attorney General*, 605 Fed.
Appx. 951, 953 (CA11 2015) (*per curiam*); *Guaman-Yuqui*
v. *Lynch*, 786 F. 3d 235, 240 (CA2 2015) (*per curiam*);
*Gonzalez-Garcia* v. *Holder*, 770 F. 3d 431, 434–435 (CA6
2014); *Yi Di Wang* v. *Holder*, 759 F. 3d 670, 675 (CA7
2014); *Urbina* v. *Holder*, 745 F. 3d 736, 740 (CA4 2014).

That is likely because the Court's "common sense" de-
pends on a very specific understanding of the purpose of a
notice to appear. In the Court's eyes, notices to appear
serve primarily as a vehicle for communicating to aliens
when and where they should appear for their removal
hearings. That is certainly a reasonable interpretation
with some intuitive force behind it. But that is not the
only possible understanding or even necessarily the best
one. As the Government reasonably explains, a notice to

appear can also be understood to serve primarily as a charging document. See Tr. of Oral Arg. 39–45. Indeed, much of §1229(a)(1) reinforces that view through the informational requirements it imposes on notices to appear. See, *e.g.*, §1229(a)(1)(A) ("nature of the proceedings"); §1229(a)(1)(B) ("legal authority" for "the proceedings"); §1229(a)(1)(C) ("acts or conduct alleged"); §1229(a)(1)(D) ("charges against the alien"); *ibid.* ("statutory provisions alleged to have been violated"). Interpreted in this way, a notice to appear hardly runs afoul of "common sense" by simply omitting the date and time of a future removal proceeding.[6]

Today's decision appears even less commonsensical once its likely consequences are taken into account. As already noted, going forward the Government will be forced to include an arbitrary date and time on every notice to appear that it issues. See *supra*, at 7–8. Such a system will only serve to confuse everyone involved, and the Court offers no explanation as to why it believes otherwise. Although the Court expresses surprise at the idea that its opinion will "'forc[e] the Government' to guess when and where a hearing will take place," *ante*, at 12, n. 6, it is

_____

[6] The Court responds to this point in two ways. First, it faults me for failing to offer a reason "rooted in the statutory tex[t] for treating time-and-place information as any less crucial than charging information for purposes of triggering the stop-time rule." *Ante*, at 13, n. 7. But exactly the same criticism can be leveled against the Court's own reading, which noticeably fails to offer any reason "rooted in the statutory text" why time-and-place information should be treated as any *more* crucial than charging information for purposes of triggering the stop-time rule. Second, the Court also observes misleadingly that "there is no reason why a notice to appear should have only one essential function," and that a notice to appear might thus serve the dual purpose of both presenting charges and informing an alien "when and where to appear." *Ibid.* Of course it might, but it is also equally reasonable to interpret a notice to appear as serving only one of those functions. Under *Chevron*, it was the Government—not this Court— that was supposed to make that interpretive call.

undisputed that the Government currently lacks the capability to do anything other than speculate about the likely date and time of future removal proceedings. See Tr. of Oral Arg. 47–49, 52–53. At most, we can hope that the Government develops a system in the coming years that allows it to determine likely dates and times before it sends out initial notices to appear. But nothing in either today's decision or the statute can guarantee such an outcome, so the Court is left crossing its fingers and hoping for the best. *Ante,* at 12, n. 6, 18–19.

*        *        *

Once the errors and false leads are stripped away, the most that remains of the Court's argument is a textually permissible interpretation consistent with the Court's view of "common sense." That is not enough to show that the Government's contrary interpretation is unreasonable. Choosing between these competing interpretations might have been difficult in the first instance. But under *Chevron,* that choice was not ours to make. Under *Chevron,* this Court was obliged to defer to the Government's interpretation.

In recent years, several Members of this Court have questioned *Chevron*'s foundations. See, *e.g., ante,* at 2–3 (KENNEDY, J., concurring); *Michigan* v. *EPA,* 576 U. S. ___, ___–___ (2015) (THOMAS, J., concurring) (slip op., at 1–5); *Gutierrez-Brizuela* v. *Lynch,* 834 F. 3d 1142, 1149 (CA10 2016) (Gorsuch, J., concurring). But unless the Court has overruled *Chevron* in a secret decision that has somehow escaped my attention, it remains good law.

I respectfully dissent.